[No. E003041. Fourth Dist., Div. Two. Dec. 11, 1986.]

WESTERN MUNICIPAL WATER DISTRICT OF
RIVERSIDE COUNTY et al., Petitioners, v.
THE SUPERIOR COURT OF SAN BERNARDINO COUNTY,
Respondent;
SAN BERNARDINO VALLEY MUNICIPAL WATER DISTRICT,
Real Party in Interest.

1106

**COUNSEL**

Best, Best & Krieger, Arthur L. Littleworth, Gregory K. Wilkinson, Ariel Pierre Calonne, John Woodhead, City Attorney, Clarice Turney, Assistant City Attorney, Richard A. Mulligan, Brunick, Pyle, Ludvigsen & Murray and Cynthia Ludvigsen for Petitioners.

No appearance for Respondent.

McDonough, Holland & Allen, Martin McDonough, Stuart L. Somach, Virginia A. Cahill, Alan F. Ciamporcero, James W. Dilworth, Gresham, Varner, Savage, Nolan & Tilden, Bruce D. Varner and John Nolan for Real Party in Interest.

## OPINION

**CAMPBELL, P. J.**—This case considers the propriety of a public agency's decision to proceed under an emergency exemption from an environmental impact report (EIR) required by the California Environmental Quality Act. (CEQA; Pub. Resources Code, § 21000 et seq.)[1]

By petition for writ of mandate petitioners Western Municipal Water District of Riverside County (Western), East Valley Water District (East Valley), the City of Riverside, and San Bernardino Valley Conservation District (Conservation District) in consolidated actions sought to challenge the decision of real party San Bernardino Valley Municipal Water District (real party or SBVMWD) to drill and operate two "dewatering" wells. The sole purpose of these wells would be to pump groundwater from the saturated pressure zone in the aquifer beneath the City of San Bernardino and then to discharge it into the Santa Ana River channel.

Respondent trial court granted a preliminary injunction enjoining the drilling of the two wells and subsequently heard an extended motion to dissolve the injunction. The central issue on the motion to dissolve was the propriety of SBVMWD's decision to avoid the preparation of an EIR by proceeding pursuant to the "emergency" provisions of CEQA. This determination in turn focused on the evidence presented to real party regarding the purported emergency, and of the sufficiency of that evidence to support real party's decision to invoke the "emergency" exemption. (§§ 21080, subd. (b)(4), 21060.3, 21168.5.)

The trial court heard evidence from one witness on each side, and reviewed the record. The court held that real party's use of the emergency exemption was supported by substantial evidence. The court granted the motion to dissolve on March 31, 1986, whereupon Western and all other petitioners came to this court for review of the order by petition for writ of mandate.

---

[1]All subsequent statutory references are to the Public Resources Code unless otherwise indicated.

We granted a stay of the trial court's order dissolving the preliminary injunction and issued an alternative writ. The petition for the peremptory writ is now before us for disposition.

## FACTUAL BACKGROUND

"Liquefaction" occurs when water-saturated, cohesionless soils become compacted by the pressure of seismic waves transmitted through the soil during an earthquake. This compaction forces the water upward and creates a top layer of virtual quicksand into which overlying structures may topple. The water table underlying a 10,000 acre area in San Bernardino County has been rising to the extent that in the event of a major earthquake, liquefaction might occur. Concern for liquefaction in an area containing public facilities and about half the population of the City of San Bernardino motivated SBVMWD to authorize the two dewatering wells.

The Bunker Hill Basin, site of the rising water table, is an aquifer of approximately 120 square miles which lies beneath the San Bernardino Valley and is bounded by two active earthquake faults, the San Jacinto and the San Andreas. The basin contains porous, alluvial soils to a depth of 1,200 feet. Soil tests, undertaken from 1982 to 1985, have determined that these soils are particularly vulnerable to liquefaction if jarred and compressed during an earthquake. The magnitude of the potential danger from liquefaction rises when there is an increase in water saturation of the soil. There is no dispute that the groundwater was high in 1985 and 1986.

From 1982, when the United States Geological Survey (USGS) first suggested that a liquefaction potential existed and recommended soil testing, until 1985, when the USGS and real party's independent consultant indicated explicitly that liquefaction would occur in the event of a major earthquake, soil testing proceeded. Real party's board of directors discussed the liquefication threat intermittently since 1982. The record contains a memorandum to real party's general manager dated March 16, 1982, reporting on the conclusions of a seismologist and stating, "the single most useful thing for us to do would be to lower the water table in the pressure zone to 10-15 feet."

Although real party contends that a liquefaction emergency is impending, the only evidence of imminence in the administrative record was that in 1982, the California Division of Mines and Geology concluded that a catastrophic earthquake would take place along the southern San Andreas fault before the end of the century. In 1985, a Scientific American article stated that an earthquake of 8.3 on the Richter scale had a 2 to 5 percent annual

probability of occurring and that San Bernardino was *one of* the likeliest epicenters of such a quake.

In November of 1985, real party decided to take preventive action under CEQA's emergency exemption by drilling the two wells to dewater the aquifer. Real party concedes that it would take about six years using these two proposed wells to remove the 75,000 acre feet of water necessary to mitigate the perceived danger entirely. Nevertheless, according to real party, lowering the groundwater in any amount would significantly reduce the liquefaction threat.

Petitioners argue that real party's board did not consider alternatives to the two wells and ignored a warning from its consultant that significant adverse environmental effects of these wells needed to be studied. The parties hotly dispute this issue, but petitioners point to evidence showing that contaminated plumes of groundwater, which have already forced the closure of 11 wells in the basin, might be drawn into the domestic water supplies if the dewatering wells were drilled and operated. The trial court considered this pollution potential an "item [of] valid concern." Petitioners also argue that real party did not pursue threshold investigations of environmental impact. They stress that SBVMWD simply decided to proceed under the emergency exemption, thereby avoiding the CEQA requirement of an EIR. In so doing, real party disregarded the recommendation of its own consultant, who, on June 17, 1985, recommended that "a focused environmental impact report (EIR) be prepared to address only the significant issues and concerns listed. . . ." Real party filed a notice of exemption, one which the trial court termed "extremely sketchy." The notice explained real party's reason for exemption as: "This action is necessary to mitigate or prevent an emergency consisting of serious loss of life, property damage, and loss of essential public services occurring as a result of soil liquefaction in an earthquake."

The petitions in the superior court for writ of mandate followed, on which the court ultimately ruled that the record before real party did provide substantial evidence of a "pending crisis."

DISCUSSION

Petitioners advance two contentions: (1) the evidence in the record, as a matter of law, cannot support a finding of "action needed to prevent an emergency," and (2) the trial court applied an improper standard of review.

In opposition, real party parenthetically asserts unclean hands and statute of limitations defenses against Western. However, such matters are not

properly before us in this proceeding, in that the trial court specifically ruled that Western's petition was not barred, and real party has not sought to challenge that ruling by way of its own writ. In addition, real party challenges the availability of mandate relief. On this point, it is enough to say that the absence of another adequate remedy and therefore the propriety of the petition were determined adversely to real party's position when the alternative writ was authorized. (*City of Los Angeles* v. *Superior Court* (1959) 51 Cal.2d 423, 429 [333 P.2d 745]; *Westminster Sch. Dist.* v. *Superior Court* (1972) 28 Cal.App.3d 120, 126 [104 Cal.Rptr. 388].)

I. *"Emergency" Exemption Under CEQA*

Petitioners argue that the trial court failed to construe the emergency exemption, and deferred instead to real party's erroneous interpretation of the exemption as applicable to predicted earthquakes.

Section 21080 in pertinent part provides: "(a) Except as otherwise provided in this division, this division [CEQA] shall apply to discretionary projects proposed to be carried out or approved by public agencies . . . . [¶] (b) This division shall not apply to the following: . . . [¶] (4) Specific actions necessary to prevent or mitigate an emergency. . . ."

"Emergency" is defined by section 21060.3: "'Emergency' means a sudden, unexpected occurrence, *involving a clear and imminent danger, demanding immediate action* to prevent or mitigate loss of, or damage to, life, health, property, or essential public services. 'Emergency' includes such occurrences as fire, flood, earthquake, or other soil or geologic movements, as well as such occurrences as riot, accident, or sabotage." (Italics added.)

■ It is well established that CEQA is "to be interpreted . . . to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." (*Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049]; accord, *People* ex rel. *Younger* v. *Local Agency Formation Com.* (1978) 81 Cal.App.3d 464, 476 [146 Cal.Rptr. 400].)

The trial court recognized this principle of construction for CEQA, stating that the issue of statutory construction encompassed "the crux of the conflict." We agree.

It is the courts of this state, not the parties, which have the obligation of interpreting statutes. (*Bodinson Mfg. Co.* v. *California Employment Com.* (1941) 17 Cal.2d 321, 326 [109 P.2d 935]; *Oakland Raiders* v. *City of Berkeley* (1976) 65 Cal.App.3d 623, 629 [137 Cal.Rptr. 648].) ■ As

the Supreme Court stated in *Bodinson, supra*: "We recognize . . . that an administrative agency charged with carrying out a particular statute must adopt some preliminary construction of the statute as a basis upon which to proceed. It is likewise true that the administrative interpretation of a statute will be accorded great respect by the courts and will be followed if not clearly erroneous. [Citations.] But such a tentative administrative interpretation makes no pretense at finality and *it is the duty of this court, when such a question of law is properly presented, to state the true meaning of the statute finally and conclusively, even though this requires the overthrow of an earlier erroneous administrative construction.* [Citations.] The ultimate interpretation of a statute is an exercise of the judicial power. [Citations.]" (*Bodinson, supra,* 17 Cal.2d at pp. 325-326, italics added.) In the context of CEQA, therefore, courts have defined the meaning of such terms as "project" and "on-going project," despite previous, conflicting administrative interpretations. (See *Friends of Mammoth, supra,* 8 Cal.3d at p. 259; *County of Inyo* v. *Yorty* (1973) 32 Cal.App.3d 795, 803-808 [108 Cal.Rptr. 377].)

 The "emergency" exception of section 21080, subdivision (b)(4) is obviously extremely narrow. "Emergency" as defined by section 21060.3 is explicit and detailed. We particularly note that the definition limits an emergency to an *"occurrence,"* not a condition, and that the occurrence must involve a *"clear and imminent danger, demanding immediate action."*

As one commentator has noted: "At least in principle, the emergency exemptions are appropriate, common sense provisions. The theory behind these exemptions is that if a project arises for which the lead agency simply *cannot* complete the requisite paperwork within the time constraints of CEQA, then pursuing the project without complying with the EIR requirement is justifiable. For example, if a dam is ready to burst or a fire is raging out of control and human life is threatened as a result of delaying a project decision, application of the emergency exemption would be proper." (Comment, *The Application of Emergency Exemptions Under CEQA: Loopholes in Need of Amendment?* (1984) 15 Pacific L.J. 1089, 1105, fn. omitted.)

Although SBVMWD urges that "CEQA, including its environmental impact report requirements, shall not apply to specific actions necessary to prevent or mitigate earthquakes or other soil or geological movements," this interpretation is unsupported by the text of the exemption. Such a construction completely ignores the limiting ideas of "sudden," "unexpected," "clear," "imminent" and "demanding immediate action" expressly included by the Legislature and would be in derogation of the canon that a construction should give meaning to each word of the statute. (See `Pacific Legal Foundation* v. *Unemployment Ins. Appeals Bd.* (1981)

29 Cal.3d 101, 114 [172 Cal.Rptr. 194, 624 P.2d 244].) Moreover, in the name of "emergency" it would create a hole in CEQA of fathomless depth and spectacular breadth. Indeed, it is difficult to imagine a large-scale public works project, such as an extensive deforestation project or a new freeway, which could not qualify for emergency exemption from an EIR on the grounds that it might ultimately mitigate the harms attendant on a major natural disaster. The result could hardly be intended by the careful drafting of the Legislature, and is unmistakably opposed to the policy of construing CEQA to afford the maximum possible protection of the environment. (See *Friends of Mammoth, supra,* 8 Cal.3d at p. 259.)

II. *The Standard of Review*

Despite the trial court's construction of "emergency" in CEQA, the court nevertheless sanctioned real party's invocation of the emergency exemption of section 21080, subdivision (b)(4). The court ruled: "in spite of my conclusions . . . I'm compelled to deny the Writs for the reasons stated: That it is not my prerogative nor do I wish the prerogative of second guessing [SBVMWD]." This ruling, therefore, confronts us with the question of the applicable standard of review.

Judicial review of an agency decision under CEQA is governed by sections 21168 and 21168.5 of that act. Section 21168.5 applies to decisions made *other than* as a result of "a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in a public agency, . . ." (§ 21168, see § 21168.5; see also *No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, at p. 79, fn. 6 [118 Cal.Rptr. 34, 529 P.2d 66].) The court reviews the decision in a traditional mandamus action, a proceeding in which the court's inquiry is not limited to the administrative record, but in which it may receive additional evidence.[2] Moreover, footnote 6 of *No Oil* also establishes that where "the trial court has received additional evidence [as in the case at bench], the question before it is whether substantial evidence on the whole record, including the evidence presented to it, supports the determination that no EIR was required." (*Merz* v. *Board of Supervisors* (1983) 147 Cal.App.3d 933, 937, fn. 2 [195 Cal.Rptr. 370], citing *No Oil, supra,* 13 Cal.3d at p. 79, fn. 6.)

---

[2]Section 21168.5 provides: "In any action or proceeding, other than an action or proceeding under Section 21168, to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with this division, the inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence."

In this case real party did not proceed by filing a negative declaration (§ 21080, subd. (c); see *Christward Ministry* v. *Superior Court* (1986) 184 Cal.App.3d 180, 186 [228 Cal.Rptr. 868]; *Friends of "B" Street* v. *City of Hayward* (1980) 106 Cal.App.3d 988, 1003 [165 Cal.Rptr. 514]), but by invoking a statutory exemption from the EIR requirement (§ 21080, subd. (b)(4)).

■ The parties in this matter have focused on whether the evidence in the record supports a fair argument the project would have a significant environmental impact or whether there need be only substantial evidence of such an impact. However, the question of impact is irrelevant to the emergency exemption. In contrast to negative declarations (§ 21080, subd. (c)) and "categorical exemptions" (see, e.g., §§ 21080, subd. (b)(10), 21084), the text of the emergency exemption does not address the question of impact. Indeed, the self-evident purpose of the exemption is to provide an escape from the EIR requirement despite a project's clear, significant impact.

■ The substantial evidence inquiry prescribed by section 21168.5 must therefore apply to the question of whether an emergency exists, not of the environmental impact of a remedial project. Stated differently, we conclude that where an agency seeks to avoid an EIR under section 21080, subdivision (b)(4), a reviewing court on petition for mandate must determine if there exists substantial evidence in the record to support the agency finding of an emergency.

We observe that the emergency exemption differs from the negative declaration procedure in that there is no statutory requirement of a preliminary study attending an agency decision to use the exemption. Nevertheless, it appears that the environmentally protective bias of CEQA consistent with *Friends of Mammoth* and *No Oil* can be met by a close judicial scrutiny of each element of the Legislature's detailed definition of "emergency."

At a minimum, the administrative record must disclose substantial evidence of every element of the contended exemption as defined in section 21060.3 and construed above. ■ However, our review discloses no substantial evidence that liquefaction is an *imminent* danger or that it demands immediate action. Indeed, although the court did not explicitly articulate a construction of the statute, it concluded, "if I were deciding from the record, I would say that [the record] does not support a finding of emergency."[3] We agree.

---

[3]The trial court explained: "First of all, the high groundwater level problem has been with us since the beginning of time, I guess. . . . it runs in cycles. It isn't something that has happened very recently. The present cycle has been with us for five years, going on six.

The only pertinent data regarding imminence contained in the record are as follows. Exhibit 10 is a special publication of the California Department of Conservation, Division of Mines and Geology entitled "Earthquake Planning Scenario for a Magnitude 8.3 Earthquake on the San Andreas Fault in Southern California." That portion of the paper, the "purpose, approach, and design scenario" is curiously missing from the copy of the administrative record filed with this court, but SBVMWD's summary index in the record claims "Such an earthquake . . . has a current annual probability of two to five percent, . . ." Exhibit 11, is an article published in the February 1985 issue of Scientific American, entitled, *Predicting the Next Great Earthquake in California*. That article in part describes an "analysis [concluding] the likelihood of an earthquake of magnitude 8.3 along the southern San Andreas fault is estimated to be between 2 and 5 percent per year, or about 50 percent in the next 20 to 30 years."

At the only point in their briefs to this court that SBVMWD mentions "imminent danger," it cites only exhibits E and F. Exhibit F, "Evaluating Liquefaction Potential" is a 1985 paper of the USGS; in relevant portion it concludes that liquefaction is a potential threat in the San Bernardino-Riverside area. The generalities of its conclusions and the absence of conclusions regarding imminence are qualified, viz.: "These lower magnitude events are estimated to occur about as frequently as higher magnitude events on the San Andreas fault. . . . [W]e would expect shaking strong enough to induce liquefaction to occur several times [in the entire Los Angeles region] but at different sites in a 30-to-50-yr time span, perhaps once every 6 to 8 yr somewhere within the region."

Exhibit E was prepared in 1985 by independent consultants and is entitled, "Geotechnical and Seismic Hazards Report, San Bernardino Master Plan."

---

The soil has been of the same consistency for a number of years, so that's not anything that's relatively new on the scene. And the potential for severe seismic activity has been with us for quite awhile. Ever since the last big earthquake, I guess, they have been expecting the next one.

"So these factors which existed upon what [real party] considered to be an emergency situation are something that have been with us for a long period of time, and the combination has been there for a long period of time.

"The only thing that is really changed is the amount of development that is going forward on the area of concern, and that's going forward apparently with some restrictions to compensate for the problem. But in any case, it is going forward. And that really is what the concern is about here, as I read the record.

"The attention of [real party] was brought to this set of conditions recently because of the severe earthquake in Mexico [in September 1985] and because of a lesser earthquake in the San Bernardino area. It was that set of circumstances, along with the evaluation of the potential damage because of extensive construction, if you will forgive me, [that] got [real party] excited.

"It is difficult for me to interpret this set of conditions or factors which have been with us for a long period of time as all of a sudden becoming an emergency . . . ."

As summarized by SBVMWD, the report "assess[es] the potential for liquefaction in downtown San Bernardino. The study concluded that liquefaction would occur in a large earthquake at many sites in San Bernardino." Our review of the report reveals only generalized assumptions regarding the incidence of earthquakes and their imminence. Conclusions regarding liquefaction in downtown San Bernardino included, for instance, "seismic shaking levels of less than 0.25g in general yield a low potential for liquefaction except possibly in localized areas of shallow groundwater and poor soil conditions." A generalized graph of seismic exposure for the downtown area (figure 11A) shows acceleration of 0.25g to range in likelihood from an average return period of 20 to about 125 years, with a "best estimate" of about 70 years. A 70-year return rate is mathematically equivalent to an annual likelihood of 1.4 percent.[4]

We hold that this evidence, even in aggregation, does not amount to substantial evidence of a "clear and imminent danger, demanding immediate action" as the exemption requires. The trial court's reluctant conclusion of substantial evidence of "emergency" as defined by CEQA was therefore error, and its order must be reversed.

### DISPOSITION

For the foregoing reasons, we conclude that the court erred in its order of March 31, 1986, in dissolving the preliminary injunction, thereby permitting bids for construction of the wells. Let a peremptory writ of mandate issue directing the court to vacate its order, and to enter a new and different order denying the motion to dissolve the preliminary injunction, consistent with the views expressed herein.

The alternative writ is discharged.

Kaufman, J., and Schaefer, J.,* concurred.

A petition for a rehearing was denied January 7, 1987, and the petition of real party in interest for review by the Supreme Court was denied March 4, 1987.

---

[4]We are also aware of the declaration of Herbert Wessel, which asserts, "In my opinion, the high groundwater levels currently pose an emergency situation related to the occurrence of flooding, earthquake or other related geologic movements. . . ." However, this opinion fails to speak in specific terms regarding the elements necessary for an emergency, discussed *ante*.

*Assigned by the Chairperson of the Judicial Council.