[No. B088277. Second Dist., Div. Seven. Dec. 21, 1995.]

CASTAIC LAKE WATER AGENCY, Plaintiff and Appellant, v. CITY OF SANTA CLARITA et al., Defendants and Respondents.

**COUNSEL**

Robert H. Clark, Kane, Ballmer & Berkman, Murray O. Kane and R. Bruce Tepper, Jr., for Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Theodora Berger, Assistant Attorney General, and Brian Hembacher, Deputy Attorney General, as Amici Curiae on behalf of Plaintiff and Appellant.

Carl K. Newton, City Attorney, Burke, Williams & Sorensen, J. Robert Flandrick, Harold A. Bridges and Deanna L. Ballesteros for Defendants and Respondents.

## OPINION

LILLIE, P. J.—Castaic Lake Water Agency (Castaic) appeals from judgment entered following denial of petition for writ of mandate. Castaic contends the court erred in concluding that the City of Santa Clarita (the city) and the Santa Clarita Redevelopment Agency (the agency) properly proceeded with a redevelopment plan under an exemption from the requirement of an environmental impact report pursuant to the California Environmental Quality Act (CEQA.)[1]

### STATEMENT OF FACTS AND PROCEDURAL HISTORY

The Northridge Earthquake occurred on January 17, 1994. On that same day, the federal government declared that a major disaster existed in the State of California, the Governor proclaimed a state of emergency in Los Angeles County and the city proclaimed a local emergency. On January 25, 1994, the city council authorized city staff to proceed with the preparation of a redevelopment plan for the disaster area. On February 8, 1994, the city council, by resolution, found that the entire city required a study to determine if a redevelopment project within the area was feasible. The resolution also noted the city had identified a critical need for economic development and community revitalization as incorporated in the general plan and deemed redevelopment to be necessary to achieve the goals and objectives contained therein. On February 11, 1994, the city and the agency each published notice of the hearing to be held on February 22, 1994, regarding the proposed adoption of the Santa Clarita Community Recovery Plan (the plan). The notice advised that the purpose of the plan was "to alleviate the damage caused by the January 17, 1994, so-called 'Northridge' earthquake, and succeeding and following aftershocks and related earthquakes and to provide for and facilitate the repair, restoration, demolition, and/or replacement of property or facilities damaged as a result of a disaster in the Project Area; to take all action necessary to prevent or mitigate emergencies arising out of the disaster; to eliminate blight in the Project Area; and to cause economic redevelopment and community revitalization of the Project Area as provided in the adopted General Plan." The notice further advised that persons interested could contact the deputy city manager for information concerning

[1] Public Resources Code section 21000 et seq.

the nature and extent of the plan and other related documents and that copies of the plan and related documents were on file and available for public inspection in the office of the city clerk.

On February 22, 1994, a joint public hearing of the city council and the agency board was held to consider the plan. City Manager George A. Caravalho in his agenda report indicated that since the January 17th earthquake, "staff has followed Council direction to pursue all avenues of possible relief. One such opportunity holding the promise of significant investment in the community is the creation of a Community Recovery Plan pursuant to the State Community Redevelopment Financial Assistance and Disaster Law. The proposed Recovery Plan can provide for disaster relief and, beyond that, long-term economic development and community revitalization. The latter has been of real interest to Council and the community for some time." The agenda report of Caravalho listed the primary purposes of the plan were to provide earthquake disaster relief, provide community infrastructure, conduct economic development/community revitalization activities as contained in the general plan and undertake improvements in community housing.

A report to the city council on the plan described the physical and economic conditions existing at the project site and stated that because of the age of structures, portions of the project area suffered from localized occurrences of deferred maintenance and substandard housing, which also affected housing values and rents. Estimated damage reports for the city indicated that the earthquake caused total private property damage of approximately $144,215,000. The report stated that the project area included parts of the formerly unincorporated areas of Valencia, Newhall, Canyon Country and Saugus, and that in 1988, near the date of city incorporation, a survey conducted by the county had identified infrastructure needs of the entire Santa Clarita Valley which would have required an expenditure of approximately $911 million in order to bring improvements up to typical urban standards. The report also stated that in 1992 a study of a part of the project area by GRC Redevelopment Consultants indicated that over 50 percent of the units surveyed were in need of some form of repair.

The report included a five-year implementation plan with four goals. Goal 1 was to assist in the repair and rehabilitation of damaged businesses and homes, assist homeowners and landlords with grant and loan funds to repair structural damage caused by the disaster, assist commercial, industrial and office owners to return their properties to profitable use, assist mobilehome owners and provide technical assistance to homeowners, landlords, and business owners in expediting their plans through any permit process.

Goal 2 was to repair the infrastructure damaged by the disaster and to meet the ongoing and future needs of the community. It included repairing the estimated $20 million damage caused to the city's infrastructure, repairing storm drains, traffic signals, roadways, public buildings, parks, roadway medians and bridges, and participating in the financing of the city's uninsured losses to its public buildings and associated relocation costs of private tenants. It also included repair and structural rehabilitation in association with other public agencies if needed. Also listed was the mitigation of existing infrastructure deficiencies. It stated that "[i]n order to expedite the Community's recovery from the Disaster, it will be necessary to construct infrastructure improvements which alleviate the current severe deficiencies in the City's traffic, storm drain, and park space systems. The 1988 Daniel, Mann, Johnson and Mendenhall Study of Santa Clarita Valley infrastructure deficiencies will be used as a guide, in addition to the current City Capital Improvement Program (CIP). According to the 1993 Five-Year CIP there is over $140,000,000 of needed capital improvements which are unfunded or which require a significant City share. These improvements include San Fernando Road, the Southern Pacific Railroad Corridor and other critical east-west and north-south thoroughfares." Another program was the construction of infrastructure to prepare for future disasters, specific projects included the development of an emergency operations center on the civic center site, rehabilitation and structural reinforcement of existing bridges, abutments, critical public safety facilities and other structures which may fail during any future disasters. The plan also called for the construction of circulation improvements and stated, "The Disaster, and the resulting freeway closures, indicated a need to prepare for future Disasters through the improvement of non-vehicular transportation modes and additional thoroughfares. The Agency proposes to participate in the provision and construction of Metrolink improvements, one or more Park and Ride facilities, community bikeways, commuter rail trail, the Santa Clara River bikeway, Sierra Highway Bridge improvements, Via Princesa corridor construction and other similar circulation improvements." The plan also proposed to use the city's economic development and community revitalization element of the general plan to guide in the construction of other improvements necessary to preserve and enhance the community's economic base.

As goal 3, the agency proposed to provide for the economic development and revitalization of the community in accordance with the general plan. This included the redevelopment of various sites in the community which had been identified as important to the success of the community economic development and community revitalization efforts, including the Newhall Commercial Corridor, the Bermite Site, the Saugus Rehabilitation Center

site, Soledad Canyon Road. It also included aggressive economic development efforts essential to the creation of additional jobs and the mitigation of the effect of the disaster on the economic and investment climate of the community. The report stated "[t]hese efforts may include land assembly for major development projects, assistance with needed infrastructure which cannot be afforded by the private sector acting alone, land cost writedown in accordance with State Community Redevelopment Law, and other eligible forms of assistance. These funds may also be used for community meeting center improvements associated with tourism."

Goal 4 was to improve and expand the community's supply of low- and moderate-income housing. The most immediate need was for replacement housing for structures which had been damaged beyond economic repair, estimated to be over 133 units. Grants and loans were to be provided to qualifying families for major repairs and rehabilitation and to property owners with 50 percent or more of tenants eligible as low-income households. The plan called for implementation of the general plan housing element policy 1.g., which called for loans in association with local lending institutions to encourage the development of infill parcels. Also included in this goal was a first time home buyers program, to institute a program, in conjunction with local lenders and mortgage brokers, to provide down payment assistance and second trust deeds. The plan called for the provision of parcels for the development of self-help, sweat-equity programs for lower income households, where appropriate the provision of additional funds to target abatement of nuisance properties in lower-income neighborhoods, the allocation of funds for a program which provides grants for emergency repairs for very low income households and disabled residents, funding for projects which meet the agency's inclusionary housing requirements under the Community Redevelopment Law, and the provision of housing for senior citizens, large families and the homeless.

The report also stated that a lifetime expenditure of $1.1 billion was projected as a result of the recovery plan implementation. The report stated "[i]f the earthquake damage estimate is pegged at $210 million dollars, then a 'loan' (or bonds) issued to meet this cost would require annual payments of 13.7 million dollars over a thirty (30) year period for a total expenditure of $410 million dollars. Using the county's 1988 Daniel, Mann, Johnson, Mendenhall infrastructure deficiency study as a guide, some $911 million dollars in infrastructure deficiencies exist in our community. Financing of this cost as above would yield annual payments of $59.3 million dollars and an ultimate bottom line of $1.778 billion dollars."

The project area boundaries were drawn initially to include the entire city, 27,321 acres, as of the date of its incorporation in December 1987. Thereafter, the city removed 8,670 acres of land from the project.

Don Duckworth, special consultant, employed by the city to assist in the development of the plan reported that while the city had just incorporated, hired staff, adopted capital improvements and operating budgets, the earthquake seemed to knock the city "back to the bottom of the hill and put [it] in a position where you have to start all over." He reported, though, that they had been able to find a "silver lining." He described the silver lining as the "opportunity for the Council to recover by utilizing the Community and Redevelopment Disaster Law in order to, not only recover and provide disaster relief from the earthquake, but also to advance some principal purposes that you identified in your adopted General Plan."

By resolution, the agency adopted the plan and recommended its adoption by the city council. The agency found that the adoption of the plan and all related documents was exempt as a project from CEQA. The city council, thereafter, approved and adopted the plan and found that the plan and related documents were exempt from CEQA as a project pursuant to Public Resources Code section 21080, subdivision (b)(3) and (4).

On or about February 25, 1994, a notice of exemption was filed with the county clerk of the County of Los Angeles.

On March 31, 1994, Castaic, a public agency that supplies water to the Santa Clarita Valley, filed a petition for writ of mandate in superior court challenging the finding by the city and agency that the project was exempt from CEQA pursuant to Public Resources Code section 21080, subdivision (b)(3) and (4).

## Discussion

The parties agree that the applicable standard of review is pursuant to the provisions of Public Resources Code section 21168.5. That section provides in relevant part that in an action or proceeding, other than one under section 21168, "to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with this division, the inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (See *Western States Petroleum Assn.* v. *Superior Court* (1995) 9 Cal.4th 559, 568 [38 Cal.Rptr.2d 139, 888 P.2d 1268]; *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 392 [253 Cal.Rptr. 426, 764 P.2d 278].) " 'Substantial evidence' is defined by the Guidelines . . . [and] '. . . means enough relevant information and reasonable inferences from this information

that a fair argument can be made to support a conclusion, even though other conclusions might also be reached. Whether a fair argument can be made is to be determined by examining the entire record. Mere uncorroborated opinion or rumor does not constitute substantial evidence.' (Guidelines, § 15384, subd. (a).)" (*City of Pasadena* v. *State of California* (1993) 14 Cal.App.4th 810, 821-822 [17 Cal.Rptr.2d 766].)[2]

## I. EXHAUSTION OF ADMINISTRATIVE REMEDIES

The Legislature has established statutory exemptions from CEQA. (See Pub. Resources Code, § 21080, subd. (b).) "The determination of whether an activity is exempt from CEQA is made as a part of the preliminary review process. That process is described in Guidelines section 15060, which makes it clear that the applicability of an exemption must be made *before* the agency begins its formal environmental evaluation of the project." (*City of Pasadena* v. *State of California*, *supra*, 14 Cal.App.4th at p. 820, italics in original, fn. omitted.) When a public agency decides that a project is exempt, it may file a notice of exemption. The filing of such a notice and the posting on the "list of notices" start a 35-day statute of limitations period for legal challenges to the agency's decision that the project is exempt from CEQA. If a notice of exemption is not filed, a 180-day statute of limitations applies. (Guidelines, § 15062, subds. (a) and (d).) A project that is statutorily exempt is exempted from all further CEQA provisions.

■ Appellant asserts that the trial court incorrectly allowed respondents to assert the defense of exhaustion of administrative remedies.[3] We agree. The Guidelines provide that the filing of a notice of exemption and the posting on the list of notices start a 35-day statute of limitations period on legal challenges to the agency's decision that the project is exempt from CEQA. Castaic filed its petition for writ of mandate within that statutory

---

[2]References to Guidelines are to the state CEQA guidelines which implement CEQA. (Cal. Code Regs., tit. 14, § 15000 et seq.)

[3]Public Resources Code section 21177, subdivision (a) provides: "No action or proceeding may be brought pursuant to Section 21167 unless the alleged grounds for noncompliance with this division were presented to the public agency orally or in writing by any person during the public comment period provided by this division or prior to the close of the public hearing on the project before the issuance of the notice of determination." Subdivision (b) provides: "No person shall maintain an action or proceeding unless that person objected to the approval of the project orally or in writing during the public comment period provided by this division or prior to the close of the public hearing on the project before the issuance of the notice of determination." Subdivision (e) provides that this section "does not apply to any alleged grounds for noncompliance with this division for which there was no public hearing or other opportunity for members of the public to raise those objections orally or in writing prior to the approval of the project, or if the public agency failed to give the notice required by law."

period satisfying the requirements of the guidelines. Nowhere in these guidelines are there administrative procedures that must first be followed before a petition for writ of mandate may be filed. "It would be paradoxical to construe CEQA to require [Castaic] to present a complete explication of its objections to the claimed exemption" before the notice of determination that the project is exempt is filed. (See *City of Pasadena* v. *State of California*, *supra*, 14 Cal.App.4th at p. 821.)

To the extent that respondent argues that Castaic was present at a public hearing where the plan was adopted and should have objected to the finding that the project was exempt, the record reflects that Castaic's general manager asked for a delay in the proceedings in order to consult with its board but said request was ignored.

## II. EXEMPTION UNDER CEQA

■ Appellant contends that the trial court erroneously held the recovery plan qualified for an emergency exemption under CEQA. That contention is well taken. Public Resources Code section 21080, subdivision (b)(3) exempts from CEQA "Projects undertaken, carried out, or approved by a public agency to maintain, repair, restore, demolish, or replace property or facilities damaged or destroyed as a result of a disaster in a disaster-stricken area in which a state of emergency has been proclaimed by the Governor pursuant to Chapter 7 (commencing with Section 8550) of Division 1 of Title 2 of the Government Code." Public Resources Code section 21080, subdivision (b)(4) exempts "Specific actions necessary to prevent or mitigate an emergency." Public Resources Code section 21060.3 defines emergency as "a sudden, unexpected occurrence, involving a clear and imminent danger, demanding immediate action to prevent or mitigate loss of, or damage to, life, health, property, or essential public services. 'Emergency' includes such occurrences as fire, flood, earthquake, or other soil or geologic movements, as well as such occurrences as riot, accident, or sabotage."

In concluding that the project was exempt from CEQA, the trial court stated: "The fact that a pre-disaster potential redevelopment plan addressed conditions that a disaster restructuring plan also addresses is not a determinative factor. [¶] Moreover, net monetary earthquake damage (e.g., $210,790,863) does not necessarily limit the scope of a redevelopment plan properly exempted from CEQA. Simply repairing earthquake damage is not the purpose of the disaster exemption. It is within the scope and purpose of the Disaster Law (see, e.g., Health and Saf., §§ 34013, 34004) that an entire area of a potential redevelopment plan or urban renewal project may be

included in a proper exemption. Even though parts of the precise redevelopment area were not directly damaged by the disaster, so long as there is a logical synapse between the precisely damaged property, which needs immediate attention, and the other undamaged property within the plan and within the affected land use sphere of damaged property, the Disaster Law applies. Those conditions are met here."

As appellant argues, the administrative record "unmistakably shows a predominant focus" on infrastructure and economic revitalization measures rather than the activities listed in the exemption statutes. Public Resources Code section 21080, subdivision (b)(3), plainly and expressly exempts only those projects "to maintain, repair, restore, demolish, or replace property or facilities damaged or destroyed as a result of a disaster in a disaster-stricken area." The proposed plan encompasses much of the city and in addition to maintaining, repairing, restoring, demolishing or replacing property or facilities damaged or destroyed by the Northridge earthquake seeks to among other things construct facilities independent from the earthquake, infrastructure improvements to alleviate deficiencies in the city's traffic, storm drain and parks space system identified in a 1988 study, construct infrastructure to prepare for future disasters, construct commuter rails and bikeways, and to redevelop sites identified as important to the success of the community's economic development and revitalization efforts.

Additionally, the plan is not limited to those specific actions "necessary to prevent or mitigate an emergency" as required by the exemption contained in Public Resources Code section 21080, subdivision (b)(4).

In *Western Mun. Water Dist.* v. *Superior Court* (1986) 187 Cal.App.3d 1104 [232 Cal.Rptr. 359], the court reasoned: "The 'emergency' exception of section 21080, subdivision (b)(4) is obviously extremely narrow. 'Emergency' as defined by section 21060.3 is explicit and detailed. We particularly note that the definition limits an emergency to an '*occurrence*,' not a condition, and that the occurrence must involve a '*clear and imminent danger, demanding immediate action.*' [¶] . . . '. . . The theory behind these exemptions is that if a project arises for which the lead agency simply *cannot* complete the requisite paperwork within the time constraints of CEQA, then pursuing the project without complying with the EIR requirements is justifiable. For example, if a dam is ready to burst or a fire is raging out of control and human life is threatened as a result of delaying a project decision, application of the emergency exemption would be proper.' [Citation.] [¶] Although SBVMWD urges that 'CEQA, including its environmental impact report requirements, shall not apply to specific actions necessary

to prevent or mitigate earthquakes or other soil or geological movements,' this interpretation is unsupported by the text of the exemption. Such a construction completely ignores the limiting ideas of 'sudden,' 'unexpected,' 'clear,' 'imminent' and 'demanding immediate action' expressly included by the Legislature and would be in derogation of the canon that a construction should give meaning to each word of the statute. [Citation.] Moreover, in the name of 'emergency' it would create a hole in CEQA of fathomless depth and spectacular breadth. Indeed, it is difficult to imagine a large-scale public works project, such as an extensive deforestation project or a new freeway, which could not qualify for emergency exemption from an EIR on the grounds that it might ultimately mitigate the harms attendant on a major natural disaster. The result could hardly be intended by the careful drafting of the Legislature, and is unmistakably opposed to the policy of construing CEQA to afford the maximum possible protection of the environment. [Citation.]" (187 Cal.App.3d at pp. 1111-1112, italics in original.)

Contrary to respondents' assertion, the record here does not present a situation where " '[R]ules regulating the protection of the environment . . . [have been] subverted into an instrument for the oppression and delay of social, economic, or recreational development and advancement.' [Citation.]" (*Laurel Heights Improvement Assn.* v. *Regents of University of California* (1993) 6 Cal.4th 1112, 1132 [26 Cal.Rptr.2d 231, 864 P.2d 502].) Rather, it appears that this is an attempt to use limited exemptions contained in CEQA as a means to subvert rules regulating the protection of the environment.

■ While the trial court stated the project was within the scope and purpose of the Community Redevelopment Financial Assistance and Disaster Project Law (Health & Saf. Code, §§ 34000, 34013) the requirement to undertake environmental review has not been deleted from that law. Health and Safety Code section 34013 dispenses with many prerequisites for redevelopment and urban renewal projects in "disaster areas" but compliance with CEQA is not one of them. Health and Safety Code section 33352 provides in pertinent part that "Every redevelopment plan submitted by the agency to the legislative body shall be accompanied by a report containing all of the following: [¶] . . . [¶] (k) The report required by Section 21151 of the Public Resources Code." Public Resources Code section 21151 relates to the preparation and completion of the environmental impact report.

Based on the foregoing, we conclude that there is no substantial evidence in the record to support the determination that the adoption of the plan is exempt as a project from CEQA.

## DISPOSITION

The judgment is reversed with directions to the trial court to grant a peremptory writ of mandate ordering respondents to vacate their notice of exemption. Each party to bear its own costs on appeal.

Johnson, J., and Woods (Fred), J., concurred.