[No. D038885. Fourth Dist., Div. One. Oct. 9, 2002.]

CALBEACH ADVOCATES, Plaintiff and Appellant, v.
CITY OF SOLANA BEACH et al., Defendants and Respondents;
JONATHAN CORN et al., Real Parties in Interest and Respondents.

## COUNSEL

Worden, Williams, Richmond, Brechtel & Kilpatrick, Donald Wayne Brechtel, Scott Williams; and Richard J. Wharton for Plaintiff and Appellant.

Remy, Thomas & Moose, James G. Moose, Tiffany K. Wright; and Celia A. Brewer, City Attorney, for Defendants and Respondents.

Jonathan C. Corn for Real Parties in Interest and Respondents.

## OPINION

**O'ROURKE, J.**—CalBeach Advocates (CalBeach), a nonmember, nonprofit public benefit corporation, appeals the denial of its petition for a writ of mandate to vacate the approval of a special use permit to construct a seawall by the City of Solana Beach (Solana Beach). CalBeach contends the

court erred when it affirmed Solana Beach's finding of an emergency under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[1] and when it held Solana Beach had no duty to make findings; and even if it had a duty, the findings it made were adequate. We affirm.

FACTUAL AND PROCEDURAL HISTORY

This case concerns a project to build a seawall in the bluff below the homes of Jonathan Corn and J. Harold Scism and Ninni V. Scism, real parties in interest (Real Parties).

Solana Beach's coast consists of sand beaches backed by steep coastal bluffs 65 to 90 feet high. The steep lower portion of the coastal bluffs consists of Torrey sandstone. The sloping upper portion of the bluffs consists of about 10 feet of clean sand, topped by moderately consolidated sand, and capped by a 10-foot cemented clay sand deposit.

Although there was no appreciable erosion of Solana Beach's coastal bluffs for about a century, 1997-1998 El Niño storms caused about 21 percent of the coastal bluffs to collapse. Over the years, damming and sand mining of the rivers that feed into the Pacific Ocean have essentially denuded the beaches of sand, allowing waves to break directly on the coastal bluffs, creating sea caves and notches in the sandstone. When a notch or sea cave reaches a depth of about 10 to 12 feet, the weight of the overhang exceeds the strength of the sandstone supporting it and the sandstone base of the bluff collapses.

The collapse of the sandstone base triggers a series of collapses of the upper slope until the upper slope reaches a sustainable angle of about 34 degrees. These collapses extend to the top of the slope and can threaten the houses and other structures built on top of the bluff.

Real Parties' project concerns a notch in a 74-foot stretch of coastal bluff between two existing seawalls. On February 24, 2000, a 10-foot overhang immediately north of the area collapsed, fracturing the Torrey sandstone of the bluff. Over the ensuing months, the notch at the base of the bluff deepened to about 12 feet. The fracture created a very high likelihood that the bluff would collapse during the following winter storm season. Such a collapse would place the Real Parties' homes in danger because the homes are situated very close to the edge of the bluff. A collapse could occur at any

---

[1]All further statutory references are to the Public Resources Code unless otherwise specified.

time, putting the public at risk if it occurred at low tide when the beach might be occupied.

In January 2000, Real Parties applied for a permit to fill the notch. On February 29, 2000, the Solana Beach Planning Department (the Planning Department) issued a director's use permit with conditions. In June 2000, Real Parties requested a modification of the use permit to allow construction of a steel-reinforced structure. The Planning Department determined the new design required a special use permit and scheduled a hearing before the Solana Beach City Council (the City Council) on September 29, 2000. Due to a scheduling conflict, Real Parties requested the City Council hearing be delayed. On October 11, 2000, the Planning Department issued a proposed mitigated negative declaration for public review and comment.

In a letter dated November 16, 2000, Real Parties' engineer, David Skelly, wrote in part: "After a recent site visit . . . , I found it necessary to inform [Real Parties] that they need to take *immediate action* to protect their homes by construction appropriate bluff armoring devices.

"This emergency situation is the result of several factors. The bluff immediately to the north of the subject properties experienced a significant failure in late February 2000. This failure exposed a 10 to 15 foot section of loose sands above the Torrey sandstone. These loose sands are rapidly eroding away from the mid-bluff in the area immediately adjacent to the Corn property. Moreover, this erosion is rapidly propagating to southwards toward the subject properties. It may be *a matter of weeks* before this enlarges to a massive failure, which will likely expose the foundations of [Real Parties'] homes . . . . In addition to the mid-bluff failure in progress, a large fissure in the Torrey sandstone directly below the Corn home has grown and enlarged significantly since it first appeared in late February 2000. Finally, the undercutting (notching) of the Torrey sandstone along the foot of the bluff has increased by one foot or more since January 2000.

"These conditions, in light of the pending winter waves and rains, and lack of protective beach sand, will most certainly lead to a catastrophic failure of the bluff directly below the [Real Parties'] homes. Bluff failure will place the homes and the beach-going public in immediate jeopardy. There have been significant failures immediately to the north and immediately to the south of these properties. The current condition of the bluff is the same as the bluff conditions on the adjacent properties just prior to their failures. However, [Real Parties'] properties are at an even greater risk as compared to other properties due to their proximity (approximately 8 feet) from the bluff edge." (Italics added.)

On December 5, 2000, Real Parties requested a permit under the emergency exemption. (§ 21080, subd. (b)(4).) In that request, Walter F. Crampton, a civil and geotechnical engineer,[2] stated: "If this remaining section of coastline is not stabilized, there is a high likelihood that this section of coastal bluff will also collapse this winter, placing the bluff-top residences in immediate peril. Moreover, there is no question that if construction is to be deferred until after certification of the City's EIR, this coastal bluff will collapse."

Prior to the City Council meeting on December 19, the community development director recommended the City Council either exempt the project as an emergency or adopt a mitigated negative declaration. The director also recommended the City Council approve a special use permit. At the public hearing on December 19, the City Council passed resolution No. 2000-98, which approved the application under CEQA's emergency exemption and granted the special use permit. On December 20, Solana Beach filed notices of exemption with San Diego County and the State of California.

On June 12, 2001, CalBeach filed a petition for writ of administrative mandamus setting aside the approval and notice of exemption for Real Parties' project as well as a complaint for declaratory and injunctive relief to require Solana Beach to certify an environmental impact report (EIR) for its shoreline and coastal bluff protection ordinance. On June 12, Solana Beach and Real Parties filed motions for summary adjudication on the petition for writ of mandate setting aside the approval and CEQA exemption of Real Parties' project. After a hearing held on July 20, the court granted the motion for summary adjudication.

## DISCUSSION

### I. Statutory Exemption for Emergencies

#### A. Standard of Review

Under CEQA, we review agency determinations for substantial evidence. (§§ 21168, 21168.5.) " ' "Substantial evidence" is defined by the Guidelines . . . [and] ". . . means enough relevant information and reasonable inferences from this information that a fair argument can be made to support a

---

[2] Crampton has over 25 years of experience in geotechnnical, coastal, and hydraulic engineering, and has both designed coastal stabilization projects and studied the coasts of Encinitas and South Cardiff and San Elijo State Beaches.

conclusion, even though other conclusions might also be reached. Whether a fair argument can be made is to be determined by examining the entire record. Mere uncorroborated opinion or rumor does not constitute substantial evidence." (Guidelines, § 15384, subd. (a).).)' [Citation.][3]" *(Castaic Lake Water Agency v. City of Santa Clarita* (1995) 41 Cal.App.4th 1257, 1264-1265 [49 Cal.Rptr.2d 79].) ■ Although "there is no statutory requirement of a preliminary study attending an agency decision to use the exemption[,] . . . [¶] . . . the administration record must disclose substantial evidence of every element of the contended exemption . . . ." *(Western Mun. Water Dist. v. Superior Court* (1986) 187 Cal.App.3d 1104, 1113 [232 Cal.Rptr. 359] *(Western).*)

We reject CalBeach's contention that a different standard of review is created by the following statement of the court in *Western*: "[I]t appears that the environmentally protective bias of CEQA . . . can be met by a *close judicial scrutiny of each element* of the Legislature's detailed definition of 'emergency.' " *(Western, supra,* 187 Cal.App.3d at p. 1113, italics added.) Given the Legislature's determination that courts apply the substantial evidence test, this statement means only that substantial evidence must support each element of the definition of an emergency.

### B. *Emergency Under CEQA*

■ CalBeach contends the court erred in upholding Solana Beach's finding of an emergency in that there was no sudden, unexpected occurrence and there was no need for immediate action. We disagree.

■ "Specific actions necessary to prevent or mitigate an emergency" are exempt from CEQA. (§ 21080, subd. (b)(4).) " 'Emergency' means a sudden, unexpected occurrence, involving a clear and imminent danger, demanding immediate action to prevent or mitigate loss of, or damage to, life, health, property, or essential public services. 'Emergency' includes such occurrences as fire, flood, earthquake, or other soil or geologic movements, as well as such occurrences as riot, accident, or sabotage." (§ 21060.3.) This definition "limits an emergency to an '*occurrence,*' not a condition, and . . . the occurrence must involve a 'clear and imminent danger, demanding immediate action.' " *(Western, supra,* 187 Cal.App.3d at p. 1111, some italics omitted.)

---

[3]References to Guidelines are to the state CEQA guidelines, which implement CEQA. (Cal. Code Regs., tit. 14, § 15000 et seq.)

 CalBeach contends that because beach erosion is a condition and the erosion of the bluffs causes the bluffs to fall, the failure of a bluff is a condition and not an "sudden, unexpected occurrence." Although the court in *Western* used the terms "occurrence" and "condition" in opposition to each other, the distinction is not always a sharp one. An occurrence is "something that occurs, happens, or takes place; an event, incident." (Oxford English Dict. (2d ed. 1989) <http://www.oed.comcgi/entry/00079048> [as of Oct. 9, 2002].) A condition is "a mode or state of being." (Webster's 3d New Internat. Dict. (1993) p. 473 (Webster's).) A state of being may consist of many occurrences. For example, the condition of cancer consists of many molecular occurrences, such as a cancer cell leaving a tumor and entering the bloodstream. Similarly, the condition of beach erosion is composed of many small occurrences, such as grains of sand carried by a wave striking a bluff and loosening a minute amount of bluff material. Certainly, the collapse of the Torrey sandstone base of the bluff, like an earthquake or a forest fire, is an occurrence: it is something that happens. Moreover, it is sudden, in that it happens all at once.[4]

CalBeach further contends that even if the collapse of the bluff below Real Parties' property is an occurrence, it is not an unexpected occurrence. We agree the failure of the bluff below Real Parties' homes is not unexpected. However, the anticipation of a collapse does not prevent it from being an emergency. Section 21080, subdivision (b)(4) exempts not only projects that mitigate the effects of an emergency but also projects that prevent emergencies. In order to design a project to prevent an emergency, the designer must anticipate the emergency. If we accept CalBeach's contention that all emergencies must be unexpected, then projects can never be designed to prevent emergencies. Courts must avoid statutory interpretations that nullify other provisions of the same statute: " 'The meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible. [Citation.] . . . An interpretation that renders related provisions nugatory must be avoided [citation]; each sentence must be read not in isolation but in the light of the statutory scheme [citation] . . . .' [Citation.]" (*Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 659 [25 Cal.Rptr.2d 109, 863 P.2d 179].) For that reason, we do not interpret section 21060.3 to require that emergencies be unexpected when the project's purpose is to prevent the emergency.

---

[4]"Sudden" can be defined as "changing character or angle all at once." (Webster's, *supra,* at p. 2284.)

■ CalBeach also contends substantial evidence does not support the finding that the notch that developed in the bluff required immediate action.[6] CalBeach bases its contention on the length of time between the bluff fracture in February 2000 and the application for an emergency permit in December 2000. As discussed in Skelly's November 16 letter, the clean sands in the middle of the bluff and the fissure in the Torrey sandstone eroded quite rapidly, such that the notching in the sandstone increased by at least a foot since January. It was this rapid erosion that resulted in an emergency by November 16, when that letter was written. Further, Skelly stated the bluff condition had become an emergency; the bluff could collapse "within a few weeks," requiring "immediate action." Crampton stated, "If this remaining section of coastline is not stabilized, this coastal bluff will also collapse, placing the bluff-top residences in *immediate* peril." (Italics added.) The professional opinion of these two engineers, both of whom have substantial experience in coastal stabilization projects and coastal erosion, provides substantial evidence that the condition of the bluff required immediate action.

Substantial evidence provided by professional engineers Crampton and Skelly also supports each remaining element of the definition of an emergency. In terms of finding the collapse was imminent, Crampton stated the bluff would likely collapse during the storms that winter. Skelly stated the bluff could collapse within weeks of November 16 and clarified his opinion as follows: "As a licensed professional I have a responsibility to identify hazards to public safety and to private property. I take this responsibility very seriously, and in the 20 years I have been a practicing engineer I have only declared one other site, in Encinitas, an emergency situation."

Substantial evidence supports a finding that the collapse of the bluff could cause damage to life, health, and property. Real Parties' residences are situated a mere eight feet from the edge of the bluff. For that reason, any collapse of the bluff would place both properties in danger. Further, the bluff collapse could threaten the safety of members of the public if it occurred when members of the public were near the bluff.

## II. *Findings*

■ We reject CalBeach's contention that the trial court erred when it ruled (1) section 21168.5 governs this action; (2) Solana Beach had no duty to make findings; and (3) the findings were adequate. ■ Section 21168

---

[6]CalBeach's contentions concerning Solana Beach's failure to prepare an EIR concerning its 1994 ordinance concern the cause of action that is not the subject of this appeal. For that reason, we do not consider such contentions.

and section 21168.5 govern the review of CEQA determinations, findings, or decisions by a public agency. Section 21168 governs the review when it was "made as a result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in a public agency . . . ." Section 21168 applies only to agency determinations that are quasi-adjudicatory in character and have been made after a mandatory public hearing. (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514-515 [113 Cal.Rptr. 836, 522 P.2d 12]; *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 567-568 [38 Cal.Rptr.2d 139, 888 P.2d 1268].) Although the standard of review is identical in the two sections, "[s]ection 21168 requires the agency make findings supporting its decision, while section 21168.5 does not." (*Association for Protection etc. Values v. City of Ukiah* (1991) 2 Cal.App.4th 720, 729 [3 Cal.Rptr.2d 488] (*Ukiah*).)

 Neither CEQA nor the Solana Beach Municipal Code (Municipal Code) requires a separate, additional hearing in order to decide that the emergency exemption applies to a proposed project. CEQA does not generally require agencies to hold public hearings before making environmental decisions. (Guidelines, § 15202, subd. (a.).) Hearings are required only in limited situations, specified by statute. (See, e.g., § 21083.3 [hearing required for substituting mitigation measures when adopting a mitigated negative declaration].) Further, Municipal Code chapter 18.04, entitled Environmental Protection, does not require a public hearing to determine whether a CEQA project is exempt under CEQA. (Mun. Code, § 18.04.070, subd. A.)[6] Municipal Code chapter 17.62, entitled Shoreline and Coastal Bluff Protection, provides that a special use permit for a sea wall or bluff retaining wall may be issued only after a public hearing and a resolution of the City Council. (Mun. Code, §§ 17.62.050, 17.62.080, 17.62.090.) However, nothing in that chapter requires a public hearing to determine whether the project is exempt from CEQA.

Two cases have considered whether courts review an agency's determination that a project is subject to a categorical exemption under 21168 or section 21168.5; both held section 21168.5 governed. (*Ukiah, supra,* 2 Cal.App.4th at p. 731; *Dehne v. County of Santa Clara* (1981) 115 Cal.App.3d 827, 836 [171 Cal.Rptr. 753].) In *Ukiah,* the agency held a public hearing concerning the issuance of a site development permit, as it was required to do under the city ordinance. (*Ukiah,* at p. 729.) During that public hearing, the agency also determined the project was subject to a

---

[6]Municipal Code section 18.04.070, subdivision A states: "The director shall determine whether a private project, other than a ministerial project, is excepted or exempted from the requirements of this chapter."

categorical exemption. (*Id.* at p. 725.) Because no statute or ordinance required the agency to hold a public hearing prior to determining the project qualified for a categorical exemption, the court held section 21168.5 governed the action. (*Ukiah,* at p. 730.)

The court concluded as follows: "It makes sense to review the grant of a categorical exemption under section 21168.5, whether made in the context of issuance of a building permit, a site development permit or an application for some other type of governmental approval or entitlement, unless local ordinances expressly require a public hearing on the exemption decision. To hold otherwise might discourage agencies from combining and coordinating their approval processes as recommended by CEQA. Further, our decision is consistent with CEQA's encouragement of environmental review at the earliest feasible stage [citation] and conforms to the definition of a [*sic*] the 'project' as 'the whole of an action' and the focus upon the 'activity which is being approved' and not each separate government approval. [Citation.]" (*Ukiah, supra,* 2 Cal.App.4th at p. 731.)

This case parallels *Ukiah.* The City Council held a mandatory public hearing prior to approving the project. At that hearing, the City Council determined the emergency exemption applied to the project, although the City Council was not required to hold a public hearing to make that determination. Therefore, we review Solana Beach's determination that the emergency exemption applied under section 21168.5, which does not require findings.

CalBeach mistakenly relies upon *Myers* v. *Board of Supervisors* (1976) 58 Cal.App.3d 413 [129 Cal.Rptr. 902] (*Myers*) for the proposition that section 21168 applies to the determination of a categorical exemption. However, the parties in *Myers* agreed the court was governed by section 21168—the court did not determine which section governed the action. (*Myers,* at p. 422.)

CalBeach further contends that even if categorical exemptions are reviewed under section 21168.5, the statutory exemption for emergencies must be reviewed under section 21168 because while categorical exemptions are normally ministerial decisions not involving discretionary factfinding, the emergency exemption requires "a quasi-judicial determination to be made on a case-by-case basis by state and local agencies." Ministerial projects are exempt by statute. (§ 21080, subd. (b)(2).) "Since ministerial projects are already exempt, Categorical Exemptions should be applied only where a project is not ministerial under a public agency's statutes and ordinances." (Guidelines, § 15300.1.) Categorical exemptions, then, are for projects that do not involve ministerial decisions and may not be used if a particular

project has a significant or cumulatively significant effect. (Guidelines, § 15300.2.) Accordingly, the determination that a project falls under a categorical exemption requires discretionary factfinding. Further, the leading case on the emergency exemption reviewed the agency's grant of the exemption under section 21168.5. (*Western, supra,* 187 Cal.App.3d at p. 1113.) For these reasons, we reject CalBeach's distinction between categorical and statutory exemptions and apply section 21168.5 to our review of the emergency exemption.

CalBeach also contends a public hearing was required in this case because, under the Municipal Code, the community development director determines exemptions and the City Council hears appeals of those decisions. (Mun. Code, §§ 18.04.070, subd. A, 18.04.080.) Applying that framework, CalBeach contends the City Council's hearing on the special use permit was also an appeal of the director's grant of an emergency exemption. In this case, however, the director did not grant an emergency exemption; the director proposed that the City Council either apply the emergency exemption or grant a mitigated negative declaration. The City Council made these determinations during the public hearing on the special use permit required by Municipal Code section 17.062.080. Because section 21168.5 does not require the City Council to make findings, we need not review the adequacy of the findings it made.

### DISPOSITION

The judgment is affirmed. CalBeach to bear costs on appeal.

Huffman, Acting P. J., and Haller, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 15, 2003.