[No. H032067. Sixth Dist. Jan. 28, 2009.]

GREAT OAKS WATER CO., Plaintiff and Appellant, v.
SANTA CLARA VALLEY WATER DIST., Defendant and Respondent.

COUNSEL

Silicon Valley Law Group and Jeffrey S. Lawson for Plaintiff and Appellant.

Duane Morris, Thomas M. Berliner, Colin L. Pearce; Debra Cauble and Emily Cote for Defendant and Respondent.

OPINION

**DUFFY, J.**—Great Oaks Water Company (Great Oaks) appeals from the trial court's judgment denying its petition for writ of mandate. Through its

petition, Great Oaks challenged the Santa Clara Valley Water District's (the District) use of a statutory ratesetting exemption from the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) as part of the District Board's 2006 adoption of a resolution that raised groundwater rates within the District for fiscal year 2006–2007.[1] The exemption, section 21080, subdivision (b)(8), removes from CEQA review a public agency's setting of rates, tolls, fares, and other charges that are, as relevant here, for the purposes of meeting operating expenses; purchasing or leasing supplies, equipment, or materials; meeting financial reserve needs and requirements; or obtaining funds for capital projects necessary to maintain service within existing service areas. The exemption requires the agency to incorporate written findings in the administrative record of any proceeding in which the exemption is claimed "setting forth with specificity the basis for the claim of exemption." (*Ibid.*) The exemption is not available for rate increases to fund capital projects for the "expansion of a system," which remain subject to CEQA. (Cal. Code Regs., tit. 14, § 15273, subd. (b).)[2]

On appeal, Great Oaks reprises its contention that the District abused its discretion by failing to proceed in a manner required by law because it did not set forth with specificity the factual or evidentiary basis for its finding that its adoption of groundwater rate increases fell within the statutory rate exemption, instead, the argument goes, only parroting the exemption language without analysis or citation to factual support. Great Oaks further contends that the District's finding of the exemption's applicability is not supported by substantial evidence in the administrative record, which shows, it urges, that the increased rates were a part of the District's groundwater management policy, a purpose not covered by the exemption, and were also partly for the purpose of funding expansion of the District's system, an aim that requires CEQA review. We reject these contentions and affirm the judgment.

---

[1] Further statutory references are to the Public Resources Code unless otherwise stated.

[2] Section 21083 directs the state Office of Planning and Research to prepare and develop proposed guidelines for the implementation of CEQA by public agencies. These guidelines are set forth in title 14, section 15000 et seq. of the California Code of Regulations. "[C]ourts should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 391, fn. 2 [253 Cal.Rptr. 426, 764 P.2d 278].)

All further reference to the California Code of Regulations is to title 14, to which we will refer as Guidelines.

## STATEMENT OF THE CASE

I. *Factual Background*

The District is a public agency that was created and is governed by the Santa Clara Valley Water District Act (the Act). (Enacted by Stats. 1951, ch. 1405, p. 3337 et seq. and most recently amended by Stats. 2006, ch. 279, 71A West's Ann. Wat.—Appen. (1999 ed. & 2009 supp.) § 60-1 et seq.) It operates as a special district with jurisdiction throughout Santa Clara County.[3] The District's mission is to promote a "healthy, safe, and enhanced quality of living in Santa Clara County through watershed stewardship and comprehensive management of water resources in a practical, cost-effective, and environmentally sensitive manner." According to the respondent's brief, the District functions as a "wholesale water supplier," providing "water to various retail water suppliers within Santa Clara County" through its management of the "groundwater basin by recharging the local aquifer[] and providing treated surface water in lieu of pumping." The District's major sources of revenue are from "the imposition of charges on groundwater and from contracts for the sale of treated surface water produced by its three treatment plants." Nearly half of the County's water supply comes from groundwater basins.

---

[3] The District's statutory purposes are "to authorize the district to provide comprehensive water management for all beneficial uses and protection from flooding within Santa Clara County." (Stats. 2006, ch. 279, § 1, 71A West's Ann. Wat.—Appen., *supra*, § 60-4, subd. (a), p. supp. 5.) To effectuate these purposes, the district is specifically authorized to "(1) Protect [the] County from floodwater and stormwater of the district, including tidal floodwater and the floodwater and stormwater of streams that have their sources outside the district, but flow into the district. [¶] (2) Protect from that floodwater or stormwater the public highways, life and property in the district, and the watercourses and watersheds of streams flowing within the district. [¶] (3) Provide for the conservation and management of floodwater, stormwater, or recycled water, or other water from any sources within or outside the watershed in which the district is located for beneficial and useful purposes, including spreading, storing, retaining, and causing the waters to percolate into the soil within the district. [¶] (4) Protect, save, store, recycle, distribute, transfer, exchange, manage, and conserve in any manner any of the waters. [¶] (5) Increase and prevent the waste or diminution of the water supply in the district. [¶] (6) Obtain, retain, protect, and recycle drainage, stormwater, floodwater, or treated wastewater, or other water from any sources, within or outside the watershed in which the district is located for any beneficial uses within the district. [¶] (7) Enhance, protect, and restore streams, riparian corridors, and natural resources in connection with carrying out the purposes set forth in this section. [¶] (8) Preserve open space in Santa Clara County and support the county park system in a manner that is consistent with carrying out the powers granted by this section." (Stats. 2006, ch. 279, § 1, 71A West's Ann. Wat.—Appen., *supra*, § 60-4, subd. (c), p. supp. 5.) Included within the District's powers are the powers to store water in underground reservoirs and to import water. (*Id.*, § 60-5, subd. 5.) Thus, the management of the groundwater resource is a core function within the District's charge and authority.

Great Oaks is a private water utility company that provides groundwater to customers from its wells in Santa Clara County. It distributes for sale water to "approximately 20,000 residential, commercial and industrial service connections or approximately 100,000 individual customers in north and south Santa Clara County."

Under powers derived from the Act, the District is authorized to "levy and collect a ground water charge for the production of water from the ground water supplies within a zone or zones of the district which will benefit from the recharge of underground water supplies or the distribution of imported water in such zone or zones." (Stats. 1962, 1st Ex. Sess., ch. 38, § 7, p. 270, 71A West's Ann. Wat.—Appen., *supra*, § 60-26, p. 382.) The groundwater charge is a "basic user charge" and it "is associated with the benefit of groundwater supplies. The groundwater charge is [a] tax applied to water extracted from the groundwater basin." The groundwater charges are "in furtherance of district activities in the protection and augmentation of the water supplies for users within a zone or zones of the district which are necessary for the public health, welfare and safety . . . ." (Stats. 1962, 1st Ex. Sess., ch. 38, § 10, p. 271, 71A West's Ann. Wat.—Appen., *supra*, § 60-26.3, p. 384.) The charges are "authorized to be levied upon the production of ground water from all water-producing facilities, whether public or private, within said zone or zones of the district for the benefit of all who rely directly or indirectly upon the ground water supplies of such zone or zones and water imported into such zone or zones." (*Ibid.*) Great Oaks must pay the charges that the District imposes for extraction of groundwater from its wells.

In accordance with the Act, the District annually prepares a written report on its activities to protect and augment its water supplies. The report is to provide information on the "present and future water requirements of [Santa Clara County], the water supply available to the district, and future capital improvement and maintenance and operating requirements," financing methods, and the water charges by zone for agricultural water and nonagricultural water. (Stats. 1989, ch. 794, § 1, p. 2605, 71A West's Ann. Wat.—Appen., *supra*, § 60-26.5, p. 385.) The report is to include, among other things, "a recommendation as to whether or not a groundwater charge should be levied in any zone or zones of the district during the ensuing water year and, if any groundwater charge is recommended, a proposal of a rate or rates per acre-foot for agricultural water and a rate or rates per acre-foot for all water other than agricultural water for the zone or zones . . . ."[4] (Stats. 1989, ch. 794, § 1, p. 2605, 71A West's Ann. Wat.—Appen., *supra*, § 60-26.5,

---

[4] Also required to be included in the annual report are a financial analysis of the district's water system; the amount of groundwater produced in the proposed zone and alternative water sources; the estimated costs of recharging each zone or zones; the estimated costs of mitigating any effects of pumping; and information specifying the benefits that have been and will be

subd. (a).) The submission of the annual report initiates a mandatory public hearing process, which provides an opportunity for interested persons to appear and submit evidence concerning the subject of the report. (Stats. 1993, ch. 1195, § 31, p. 6884, 71A West's Ann. Wat.—Appen., *supra*, § 60-26.6, p. 386.)

On March 28, 2006, the District submitted its annual report for the 2006–2007 fiscal year entitled Water Utility Enterprise Report, Preliminary, March 2006 to the clerk of the board of supervisors under section 26.6 of the Act. The report contained, among other things, the District staff's recommendations and analysis concerning proposed increases to groundwater rates for the fiscal year. Staff recommended increases in municipal and industrial groundwater rates in the North County (Zone W-2) from $420 to $435 per acre-foot and in the South County (Zone W-5) from $215 to $230 per acre-foot. Staff further recommended increases in agricultural groundwater charges from $42 to $43.50 in the North County and from $21.50 to $23 in the South County.

These recommended increases represented the "Low Case" scenario of a range of potential rates, each rate correlating with a different level of service to be provided by the District. The Low Case maintained the prior year's projections and required continued deferral of many capital projects. The "High Case" reflected water rates "necessary to fund additional operations and capital investments that would be delayed indefinitely under the Low Case, plus a small increase in discretionary reserves." Other initiatives and studies that were in progress and that would result in future capital or operations projects not yet fully defined were omitted from the range of potential water rates. The recommended Low Case water rate increases were intended to "support the [District's] preliminary operating and capital budget" for the 2006–2007 fiscal year. The report did not include any reference to the rate increases being exempt from CEQA or any findings or recommendations in this regard.

In addition to the groundwater charge, the District may also and does impose a surcharge on treated water delivered under contracts with retail agencies. Under the contracts, the District has discretion to make available treated water in excess of the retailers' basic contract amounts. This excess is known as "noncontract treated water." The District acknowledges that the amount of the surcharge on treated water "affects the retailers' decisions on whether to pump groundwater or purchase treated water." For fiscal year

received within the zone or zones where a groundwater charge has been levied and collected, or is recommended to be levied and collected. (Stats. 1989, ch. 794, § 1, p. 2605, 71A West's Ann. Wat.—Appen., *supra*, § 60-26.5, p. 385.)

2006–2007, and as contained in the annual report, District staff recommended an increased surcharge on treated water under the retailer contracts from $90 to $100 per acre-foot. Staff further recommended increasing the surcharge on noncontract treated water from $50 to $60 per acre-foot. Increases in these surcharges were "intended to slightly reduce the incentive to take treated water given that the groundwater basins [were then] currently full."

The 2006–2007 recommended groundwater rate increases were initially placed on the District's April 11, 2006 board of directors' meeting agenda and continued to the May 2, 2006 meeting.[5] On that date, Great Oaks submitted a formal written objection to the groundwater rate increases and contended that the adoption of such rate increases was subject to CEQA and required assessment based on an environmental impact report. A representative of Great Oaks also appeared at the public hearing and reiterated the concerns raised in its written objection. These concerns were primarily directed to the assertion that the adoption of rates was being used to affect the status of groundwater levels by encouraging or discouraging pumping through rates, which, Great Oaks contended, resulted in environmental impact. The objections did not specifically include that the District was increasing rates for the purpose of system expansion, an action not exempt from CEQA review. (Guidelines, § 15273, subd. (b).)

The matter of the proposed groundwater rate increases was continued again to the District's May 30, 2006 board of directors' meeting. Staff again recommended to the District's Board in its agenda memo that it adopt the groundwater rate increases, this time noting that the action was statutorily exempt from CEQA under Guidelines section 15273 in that "CEQA does not apply to establishment or modification of water rates which are for the purpose of 1) meeting operating expenses, including employee wage rates and benefits, 2) purchasing or leasing supplies, equipment or materials, 3) meeting financial reserve needs and requirements, 4) obtaining funds for capital projects necessary to maintain service within existing areas."

---

[5] A notice of the hearing with respect to the North County included the statement that groundwater charges paid by customers help the District to: "Pay the costs of importing water to recharge the groundwater basin; Operate and maintain the pipelines and pumping plants that distribute imported water throughout our service area; Operate and maintain the District's reservoirs and recharge ponds which help replenish the groundwater basin; Plan and construct improvements to treatment plants, pipelines and reservoirs; Conduct groundwater protection programs, such as the District's Well Ordinance program, and programs to detect and protect groundwater from perchlorate, nitrate and other contaminants; Offer water-efficiency programs, such as the Mobile Lab and Irrigation Technical Assistance programs, toilet rebates and free household water audits; Develop recycled water to boost water supply reliability and conduct special studies to research the feasibility of using advanced treatment of recycled water to improve quality." The notice with respect to the South County contained essentially the same statements.

At the District's May 30, 2006 board of directors' meeting, the board's chief operating officer addressed Great Oaks' objections by noting that the "adoption of groundwater charges is not a project which is subject to CEQA" and that the "District sets rates based on the projects, programs and services that will be provided by the water utility during the rate year[,] not to discourage pumping or land subsidence nor to restrict underground storage or encourage purchases of surface treated water. In fact, treated water is more expensive than groundwater because of the district costs. Water utility operations funded by groundwater charges are carried out in a manner that is consistent with the District Act and that appropriately balances use of surface and groundwater supplies."

The matter was again continued to the District's board of directors' June 6, 2006 meeting with the same staff recommendations. At the meeting, the board adopted a resolution increasing the groundwater rates per the recommendations. The resolution referred to portions of the annual report in its findings, which included that the charges "are for the purpose of meeting operating expenses, purchasing or leasing supplies, equipment or materials, and meeting financial reserve needs; and obtaining funds for capital projects necessary to maintain service within existing service areas." The Board made the same finding in another resolution adopting recommended rate increases in the treated-water surcharge and another for surface water charges.[6] On the same date, the board chair reported in writing to the county board of supervisors on the board's adoption of a budget for the fiscal year, which incorporated the rate increases. The report noted that the budget was based on several factors and assumptions, including the "[a]doption of 'low case' water rates, which fund some capital projects, critical maintenance and repair activities, but do not fund significant longer-range planning and infrastructure reliability projects."

## II. *Procedural Background*

Great Oaks challenged the District's adoption of the increased groundwater charge by filing this action in July 2006. It proceeded in the court below by amended petition for writ of mandate. The District answered the petition and the matter was heard in July 2007 under section 21168.5, which is CEQA's equivalent of proceedings in traditional (Code Civ. Proc., § 1085), as opposed to administrative, mandamus. (Cf. Code Civ. Proc., § 1094.5.)

---

[6] Great Oaks does not challenge these latter rate increases, presumably because it provides only groundwater pumped from wells to its customers and does not appear to purchase treated or surface water from the District.

On July 18, 2007, the court issued its written order denying the petition. As relevant here, the order determined that the District's resolution finding that the groundwater rate increases were " 'for the purpose of meeting operating expenses, purchasing or leasing supplies, equipment or materials, and meeting financial reserve needs; and obtaining funds for capital projects necessary to maintain service within existing service areas' . . . sufficiently identifie[d] the specific basis for the claimed statutory exemption from CEQA review." The order further found that portions of the administrative record referenced in the District's Board resolution adopting the groundwater rate increases "contain relevant information that a reasonable mind might accept as sufficient to support the conclusion reached by the District; that the increase to the groundwater extraction charge and the purposes for which the increased funds would be used qualified for statutory exemption from CEQA under CEQA Guidelines [section] 15273[, subdivision] (a)."

A final judgment denying the petition was later entered and this timely appeal followed.

## DISCUSSION

### I. *Issues on Appeal*

Great Oaks contends on appeal that in adopting the groundwater rate increases, the District abused its discretion by failing to proceed in a manner required by law in that its findings in support of the statutory ratesetting exemption are insufficient to comply with section 21080, subdivision (b)(8) and Guidelines, section 15273, subdivision (c). It further contends that the District's findings concerning the applicability of the statutory exemption are not supported by substantial evidence in the administrative record[7] and what's more, that the record shows that the rate increases were adopted for purposes that preclude application of the exemption and instead mandate CEQA review.

### II. *Legal Overview and Applicable Standards of Judicial Review*

"CEQA embodies our state's policy that 'the long term protection of the environment . . . shall be the guiding criterion in public decisions.' (§ 21001, subd. (d); [citation].) As this court has observed, 'the overriding purpose of CEQA is to ensure that agencies regulating activities that may affect the quality of the environment give primary consideration to preventing

---

[7] The way in which the administrative record was labeled in this case made our review more difficult. The record is tabbed but its pages are not consecutively or consistently numbered and many pages bear no numeration. Each page of the administrative record should be numbered so that reference can easily be made to specific pages within a specific document.

environmental damage.' [Citation.]" (*San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1372 [44 Cal.Rptr.3d 128] (*San Lorenzo*).) To be consistent with this strong environmental policy, whenever the approval of a project is at issue, CEQA and the Guidelines " 'have established a three-tiered process to ensure that public agencies inform their decisions with environmental considerations.' [Citations.]" (*San Lorenzo,* at p. 1372.)

" 'The first tier is jurisdictional, requiring that an agency conduct a preliminary review in order to determine whether CEQA applies to a proposed activity. (Guidelines, §§ 15060, 15061.)' [Citation.] CEQA applies if the activity is a 'project' under the statutory definition, unless the project is exempt.[8] (See [Guidelines,] §§ 21065, 21080.) 'If the agency finds the project is exempt from CEQA under any of the stated exemptions, no further environmental review is necessary.' [Citation.]" (*San Lorenzo, supra,* 139 Cal.App.4th at pp. 1372–1373.) Where this determination has been made, an agency may, but is not required to, file a notice of exemption. (Guidelines, § 15062; *Apartment Assn. of Greater Los Angeles v. City of Los Angeles* (2001) 90 Cal.App.4th 1162, 1171 [109 Cal.Rptr.2d 504].)

■ CEQA does not generally impose procedural requirements, including for a public hearing, on an agency making an exemption determination and most statutory exemptions do not require findings to document the basis for the claimed exemption, the ratesetting exemption (§ 21080, subd. (b)(8); Guidelines, § 15273, subd. (c)) operating as an exception to this generality.[9]

---

[8] "The Legislature has specified a number of statutory CEQA exemptions. [Citations.] The Legislature also has authorized the State Resources Agency to identify other categories of exemptions, which are contained in the Guidelines. [Citation.]" (*San Lorenzo, supra,* 139 Cal.App.4th at p. 1380.) These are known as categorical exemptions. Because CEQA is statutory in origin, the Legislature has the power to create exemptions from its requirements. Projects and activities can be made wholly or partially exempt, as the Legislature chooses, regardless of their potential for adverse consequences. (*Napa Valley Wine Train, Inc. v. Public Utilities Com.* (1990) 50 Cal.3d 370, 376, 382 [267 Cal.Rptr. 569, 787 P.2d 976] (*Napa*) [statutory exemptions have in common only that the Legislature determined that each promoted an interest important enough to justify foregoing the benefits of environmental review].) A critical difference between statutory and categorical exemptions is that statutory exemptions are absolute, which is to say that the exemption applies if the project fits within its terms. Categorical exemptions, on the other hand, are subject to exceptions that defeat the use of the exemption and the agency considers the possible application of an exception in the exemption determination. (*Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 128 [126 Cal.Rptr.2d 441].)

[9] Although the Act required the District to hold a public hearing on its annual report in which the rate increases were analyzed and recommended (Stats. 1993, ch. 1195, § 31.4, p. 6884, 71A West's Ann. Wat.—Appen., *supra,* § 60-26.6, p. 386), this is distinct from a procedural requirement under CEQA mandating an administrative hearing prior to an agency's

(*San Lorenzo, supra*, 139 Cal.App.4th at pp. 1384–1386; *CalBeach, supra*, 103 Cal.App.4th at pp. 538–541 [findings not required in support of statutory emergency exemption]; Guidelines, §§ 15060, 15061.) Once it has been properly determined that an exemption from CEQA applies, an agency need not conduct further analysis or progress to the second or third tiers of the scheme's environmental review. (Guidelines, §§ 15002, subd. (k)(1), 15061, subd. (b)(1).)

Judicial review of a CEQA challenge to an agency's quasi-legislative action where no administrative hearing was required is governed by section 21168.5, which limits judicial inquiry to whether there was a prejudicial abuse of discretion.[10] (§ 21168.5; *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 74–75, fn. 3 [118 Cal.Rptr. 34, 529 P.2d 66]; *San Lorenzo, supra*, 139 Cal.App.4th at pp. 1374–1375.) "Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (§ 21168.5; see *No Oil, Inc., supra*, 13 Cal.3d at p. 88; *San Lorenzo, supra*, 139 Cal.App.4th at p. 1375.) "Generally speaking, an agency's failure to comply with the procedural requirements of CEQA is prejudicial when the violation thwarts the act's goals by precluding informed decisionmaking and public participation. [Citations.]" (*San Lorenzo, supra*, 139 Cal.App.4th at p. 1375.) While the foregoing judicial "review standard applies to case-specific issues of compliance with the law and sufficiency of the evidence," questions " 'of interpretation or application of the requirements of CEQA are matters of law,' " which are subject to de novo review. (*Ibid.*) The scope of a CEQA exemption, which is analyzed as an issue of statutory interpretation, is one

action. There is no such requirement for the determination that a statutory exemption applies. (*San Lorenzo, supra*, 139 Cal.App.4th at p. 1385; *CalBeach Advocates v. City of Solana Beach* (2002) 103 Cal.App.4th 529, 539 [127 Cal.Rptr.2d 1] (*CalBeach*); *Association for Protection etc. Values v. City of Ukiah* (1991) 2 Cal.App.4th 720, 730 [3 Cal.Rptr.2d 488] (*Ukiah*) [hearing on exemption determination not required even though hearing is still required for project approval].)

[10] Section 21168.5 provides that "[i]n any action or proceeding, other than an action or proceeding under Section 21168, to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with this division, the inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." This section "is the CEQA standard of review for traditional mandamus actions. Section 21168 [on the other hand] governs administrative mandamus proceedings. 'The distinction between these two provisions "is rarely significant. In either case, the issue before the . . . court is whether the agency abused its discretion." ' [Citations.]" (*California Farm Bureau Federation v. California Wildlife Conservation Bd.* (2006) 143 Cal.App.4th 173, 185, fn. 6 [49 Cal.Rptr.3d 169].) "Although the standard of review is identical in the two sections, '[s]ection 21168 requires the agency [to] make findings supporting its decision, while section 21168.5 does not.' [Citation.]" (*CalBeach, supra*, 103 Cal.App.4th at p. 539.)

such question. (*San Lorenzo,* at p. 1375.) Even so, the " 'substantial evidence test governs [judicial] review of the [agency's] factual determination that a project falls within a [statutory or] categorical exemption.' [Citation.]" (*Id.* at p. 1382.)

Applying the substantial evidence test in the context of a court reviewing an agency's statutory-exemption decision (where the exemption itself does not depend on whether the activity will have significant environmental effects)[11] means determining whether the record contains relevant information that a reasonable mind might accept as sufficient to support the conclusion reached. Although the agency bears the burden to demonstrate with substantial evidence that its action fell within the exemption, all conflicts in the evidence are resolved in its favor and all legitimate and reasonable inferences are indulged in to uphold findings, if possible. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 564, 570–571 [38 Cal.Rptr.2d 139, 888 P.2d 1268] [substantial evidence standard of review prescribed by § 21168.5 is analogous to substantial evidence standard of review applied by appellate courts to evaluate findings of fact made in trial courts]; *Banker's Hill, Hillcrest, Park West Community Preservation Group v. City of San Diego* (2006) 139 Cal.App.4th 249, 261, fn. 10, 264, 267, 269 [42 Cal.Rptr.3d 537] (*Banker's Hill*).) Finally, section 21080, subdivision (e)(1), states that "[f]or the purposes of this section and this division, substantial evidence includes fact, a reasonable assumption predicated upon fact, or expert opinion supported by fact."

These standards govern judicial review of an agency's quasi-legislative determination, such as the one made here, that an agency's action is statutorily exempt from CEQA both in the trial court and on appeal. We review the agency's action and not the trial court's decision. (*Lighthouse Field Beach Rescue v. City of Santa Cruz* (2005) 131 Cal.App.4th 1170, 1183 [31 Cal.Rptr.3d 901]; *Banker's Hill, supra,* 139 Cal.App.4th at p. 257.)

III. *The District Did Not Abuse Its Discretion*

A. *The Ratesetting Exemption*

Section 21080, subdivision (b)(8), provides that the "establishment, modification, structuring, restructuring, or approval of rates, tolls, fares, or other charges by public agencies which the public agency finds are for the purpose

---

[11] Most statutory exemptions, including the one at issue here, operate regardless of whether the project or activity will have a significant effect on the environment. (See, e.g., §§ 21080, subd. (b)(1)–(8), (10)–(13), 21080.01–21080.03, 21080.05, 21080.07.) But some do depend on whether the project will have such impact. (See, e.g., § 21083.3.)

of (A) meeting operating expenses, including employee wage rates and fringe benefits, (B) purchasing or leasing supplies, equipment, or materials, (C) meeting financial reserve needs and requirements, (D) obtaining funds for capital projects necessary to maintain service within existing service areas, or (E) obtaining funds necessary to maintain those intracity transfers as are authorized by city charter. [¶] The public agency shall incorporate written findings in the record of any proceeding in which an exemption under this paragraph is claimed setting forth with specificity the basis for the claim of exemption." (§ 21080, subd. (b)(8).) The Guidelines reiterate the language of the exemption and add that "[r]ate increases to fund capital projects for the expansion of a system remain subject to CEQA." (Guidelines, § 15273, subd. (b).)

The statutory ratesetting exemption effectively limits the effect of *Shawn v. Golden Gate Bridge Etc. Dist.* (1976) 60 Cal.App.3d 699 [131 Cal.Rptr. 867], in which the court held that a fare increase for existing bus service was a project subject to CEQA review. The exemption has been the subject of just two published decisions, neither of which is particularly illuminating for our purposes. (See *Condit v. Solvang Mun. Improvement Dist.* (1983) 146 Cal.App.3d 997, 1001 [194 Cal.Rptr. 683] [exemption applied to adoption of ordinance increasing rates and connection fees for water service to maintain existing levels of service]; *Surfrider Foundation v. California Coastal Com.* (1994) 26 Cal.App.4th 151, 155–156 [31 Cal.Rptr.2d 374] [exemption applies to Department of Parks and Recreation's approval of permits to install devices for collection of parking fees at state park beaches along with categorical exemption for construction of small structures].)

We first address the question of the proper construction of the ratesetting exemption, an issue of law subject to de novo review. We so begin because if a procedural violation of CEQA is shown by the District's failure to have complied with the statutory exemption language (due to insufficient findings as to the basis for the claim of exemption), we need not proceed to the second issue—whether substantial evidence supports the findings. (*San Lorenzo, supra,* 139 Cal.App.4th at p. 1384 [if procedural violation of CEQA is shown, substantial evidence prong of statutory standard does not come into play].)

B. *The District's Findings Are Sufficient to Comply With the Statutory Ratesetting Exemption*

Great Oaks contends that in order to comply with section 21080, subdivision (b)(8) and Guidelines section 15273's requirement to incorporate written findings "setting forth with specificity the basis for the claim of

exemption," an agency must cite to the substantial evidence—specific facts from the record—and provide an explanation in its findings of the rationale or analytical link between the evidence and the ultimate conclusion that the exemption applies. Said another way, Great Oaks argues that the agency's subconclusions or factual information underlying the findings that demonstrates that "the rate, toll, fare or charge was exempt must be specifically described to actually provide the basis for the claimed exemption" (italics omitted) in compliance with the statute.

■ Great Oaks' contention requires us to ascertain the proper construction of the statutory requirement for an agency to incorporate findings in the record setting "forth with specificity the basis for the claim of exemption." (§ 21080, subd. (b)(8); Guidelines, § 15273, subd. (c).) As with the rest of CEQA, we construe exemptions in accordance with generally accepted rules of statutory interpretation and not in such a manner that would impose "procedural or substantive requirements beyond those explicitly stated." (§ 21083.1.)

As we have observed, judicial review of the District's action in this case proceeds in traditional mandamus (Code Civ. Proc., § 1085) but under section 21168.5. This section, unlike section 21168 governing administrative mandamus under CEQA, does not require the agency to have made findings. Nevertheless, as we have noted, the ratesetting exemption itself here mandated the District to incorporate findings "setting forth with specificity the basis for the claim of exemption." (§ 21080, subd. (b)(8); Guidelines, § 15273, subd. (c).) Although this fact does not transform our review of the District's quasi-legislative action to one in administrative mandamus under section 21168 and Code of Civil Procedure section 1094.5, which do require findings, cases construing the adequacy of an agency's findings under those sections are useful to our analysis.[12]

---

[12] The fact that findings are required does not transform a legislative act into an adjudicatory process. (*ABS Institute v. City of Lancaster* (1994) 24 Cal.App.4th 285, 295 [29 Cal.Rptr.2d 224]; *Joint Council of Interns & Residents v. Board of Supervisors* (1989) 210 Cal.App.3d 1202, 1212 [258 Cal.Rptr. 762].) In administrative mandamus proceedings under Code of Civil Procedure section 1094.5, prejudicial abuse of discretion is established if the agency's decision "is not supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b).) This manner of establishing abuse of discretion is not used in traditional mandamus proceedings. On review in administrative mandamus, judicial inquiry extends to determining whether "substantial evidence supports the administrative agency's findings and whether these findings support the agency's decision." (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514 [113 Cal.Rptr. 836, 522 P.2d 12] (*Topanga*).) This manner of judicial review, which flows directly from the statutory language of Code of Civil Procedure section 1094.5, does not apply here where we are proceeding under principles of traditional mandamus notwithstanding the ratesetting exemption's requirement for findings by the agency. (*Heist v. County of Colusa* (1984) 163 Cal.App.3d 841, 846, 848 [213 Cal.Rptr. 278] [*Topanga* rule does not apply to judicial review of

The California Supreme Court in *Topanga* pointed out that the purpose of a findings requirement in review under administrative mandamus (Code Civ. Proc., § 1094.5) is "to bridge the analytic gap between the raw evidence and ultimate decision" and to show the "analytic route the administrative agency traveled from evidence to action." (*Topanga, supra*, 11 Cal.3d at p. 515.) Under Code of Civil Procedure section 1094.5, the agency must render findings that are sufficient "both to enable the parties to determine whether and on what basis they should seek review and, in the event of review, to apprise a reviewing court of the basis for the [agency's] action." (*Topanga*, at p. 514.) The findings requirement "serves to conduce the administrative body to draw legally relevant sub-conclusions supportive of its ultimate decision; the intended effect is to facilitate orderly analysis and minimize the likelihood that the agency will randomly leap from evidence to conclusions." (*Id.* at p. 516.)

The California Supreme Court recently applied its rule in *Topanga* in *Environmental Protection & Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459 [80 Cal.Rptr.3d 28, 187 P.3d 888] (*Environmental Protection*). There, the high court observed that an agency's findings under Code of Civil Procedure section 1094.5 "do not need to be extensive or detailed. ' "[W]here reference to the administrative record informs the parties and reviewing courts of the theory upon which an agency has arrived at its ultimate finding and decision[,] it has long been recognized that the decision should be upheld if the agency 'in truth found those facts which as a matter of law are essential to sustain its . . . [decision].' " ' [Citation.] On the other hand, mere conclusory findings without reference to the record are inadequate. [Citation.]" (44 Cal.4th at pp. 516–517.) But as the court held in *Environmental Protection*, where an agency's findings only generally refer to the administrative record even though specific reference to portions of the record supporting the ultimate conclusion is the better practice, the findings will still be determined to be sufficient if a court has "no trouble under the circumstances discerning 'the analytic route the administrative agency traveled from evidence to action.' [Citations.]" (*Id.* at p. 517.) Although we are not proceeding in administrative mandamus, we find that test to be met here.

Under the ratesetting exemption, the District was required to incorporate findings "setting forth with specificity the basis for the claim of exemption." (§ 21080, subd. (b)(8); Guidelines, § 15273, subd. (c).) We conclude that the

legislative or quasi-legislative act, which is reviewed under ordinary mandamus and is limited to determining whether agency's action has been arbitrary, capricious, or entirely lacking in evidentiary support or whether the agency failed to follow procedures required by law].)

District minimally satisfied this requirement by its identification of the statutory purposes for which it claimed its action to be exempt—the ultimate factual bases for the claim of exemption—coupled with the District board resolution's references in related findings to portions of the annual report and other information and evidence provided during the hearing process, all of which are part of the record.

█    In other words, based on the totality of the resolution's findings, we can readily ascertain the analytical route that the District traveled from evidence to action. It concluded that the purposes for the rate increases, which it specifically identified, fell within the scope of the listed purposes of the exemption. Thus, the specifically asserted "basis" for the claim of exemption is apparent—the District adopted the groundwater rate increases as discussed in its annual report for the four purposes listed in its findings and these purposes are statutorily exempt from CEQA. The ratesetting exemption provides for five allowable purposes but the District did not find the fifth one to apply. The totality of the resolution adequately exposes the District's mode of analysis and thus its findings must be upheld if they are supported by substantial evidence—a different question. That the finding identifying the statutory purposes underlying the claim of exemption is set forth in the language of the statute itself does not in and of itself invalidate the finding. There is nothing in the statute that requires an agency to do more than set forth the specific basis for the ultimate finding—that the rate increases were for one or more specifically identified exempt purposes. The statute, by its terms, does not require the agency to set forth "with specificity" its evidentiary subconclusions supporting this ultimate fact or its rationale, instead only "the basis for the claim of exemption." (§ 21080, subd. (b)(8); Guidelines, § 15273, subd. (c).)

Moreover, as we have said, although the District's findings could have been more detailed or could have made more specific reference to facts in the record, based on the totality of the resolution, the *Topanga* rule, which applies in the more rigorous review context of administrative mandamus, is nonetheless satisfied here. Despite their generality and repetition of the statutory language, the District's findings still adequately disclose its analytical path from the ultimate facts to the conclusion that the exemption applied, both for our purposes and for the purpose of enabling parties to determine whether and on what basis to seek review. Nothing more was required, particularly in the context of traditional mandamus.

Great Oaks points to the findings requirement of Guidelines section 15091 in support of its contention that the ratesetting exemption requires an agency to cite to specific evidence or facts in the record and to explain the rationale

connecting those facts to the ultimate conclusion of the exemption's applicability. Subdivision (a) of this section prohibits an agency from approving a project for which a certified environmental report identifies one or more significant environmental effects unless the agency makes one of three possible written findings for each of those effects. The findings are to be "accompanied by a brief explanation of the rationale for each." This requirement is absent from the ratesetting exemption and is thus not controlling or authoritative here. (Guidelines, § 15091, subd. (a).)

In sum, although we are not reviewing the trial court's decision, we agree with its conclusion that the findings in the District's resolution adopting the groundwater rate increases "sufficiently identif[ied] the specific basis for the claimed statutory exemption from CEQA review." The District therefore did not abuse its discretion by failing to proceed in the manner required by law in this respect.

### C. *The District's Findings Are Supported by Substantial Evidence*

In determining whether an agency's findings concerning the use of a statutory exemption from CEQA may be upheld, we review the administrative record to see that substantial evidence supports each element of the exemption. (*CalBeach, supra,* 103 Cal.App.4th at p. 536; *Western Mun. Water Dist. v. Superior Court* (1986) 187 Cal.App.3d 1104, 1113 [232 Cal.Rptr. 359], disapproved on another ground in *Western States Petroleum Assn. v. Superior Court, supra,* 9 Cal.4th at pp. 569–574.) "There must be 'substantial evidence that the [activity is] within the exempt category of projects.' [Citation.] That evidence may be found in the information submitted in connection with the project, including at any hearings that the agency chooses to hold. [Citation.]" (*San Lorenzo, supra,* 139 Cal.App.4th at p. 1386.) As we have noted, our application of substantial evidence review in the context of a challenge to an agency's use of a statutory exemption means we determine whether the administrative record contains relevant information that a reasonable mind might accept as sufficient to support the conclusion reached. All conflicts in the evidence are resolved in support of the agency's action and we indulge all reasonable inferences to support the agency's findings, if possible. (*Western States Petroleum Assn. v. Superior Court, supra,* 9 Cal.4th at pp. 564, 570–571; *Banker's Hill, supra,* 139 Cal.App.4th at pp. 261, fn. 10, 264, 267, 269.)

The District's resolution contained the finding that the groundwater rate increases were "for the purpose of meeting operating expenses, purchasing or leasing supplies, equipment or materials, and meeting financial reserve needs;

and obtaining funds for capital projects necessary to maintain service within existing service areas." All of these stated purposes fall within the scope of the ratesetting exemption. (§ 21080, subd. (b)(8); Guidelines, § 15273.) Great Oaks contends that this finding is not supported by substantial evidence. Specifically, it argues that the record shows that the rate increases were for purposes that included the management and manipulation of groundwater supplies and expansion of the District's services, activities that it argues would exceed the scope of the exemption and mandate environmental review.

In its conclusion that the District's finding concerning the applicability of the statutory ratesetting exemption was supported by substantial evidence, the trial court observed that the District's Board resolution "specifically references the Annual Report prepared by the District's staff and the public hearings on the report . . . . The Annual Report and transcripts of the public hearings are included in the administrative record at Tabs 12, 29, 30, 49, 60 and 64 respectively. These portions of the record contain relevant information that a reasonable mind might accept as sufficient to support the conclusion reached by the District; that the increase to the groundwater extraction charge and the purposes for which the increased funds would be used qualified for statutory exemption from CEQA . . . ." Again, although we are not reviewing the trial court's decision, we nevertheless agree with its conclusion that the District's use of the ratesetting exemption is supported by substantial evidence in the administrative record.

The District's annual report is a voluminous document that contains discussion and analysis of the groundwater rate increases as proposed and includes budget projections that take into account the recommended rate increases. It also discusses in detail the District's water requirements and supplies, the benefits and services provided by the District, and its financial outlook. But with respect to the groundwater rate increases, the report makes clear that they were the Low Case, maintaining the prior year's projections and correlating with maintenance of a level of service that would not fund "additional operations and capital investments." Such projects would have to be "delayed indefinitely" unless the High Case rate increases were adopted, which was not recommended and did not happen. Moreover, as illustrated by the report, the District's systems that are shown to be funded through its budget and capital investment focus not on expansion of services but rather on service maintenance, improved water quality, conservation, and monitoring. Further, the report states that the District is required to make "significant investments to maintain and safeguard *existing* water supplies, infrastructure, and programs to ensure a reliable water supply into the future." (Italics added.)

In terms of its budget for the 2006–2007 fiscal year, the annual report shows that the District projected operations costs to be $7.6 million more than the prior year. This increase was "due to District efforts to: (1) replace or repair relief valves, (2) install automated groundwater level monitoring equipment, (3) repair corroded clarifier mechanisms . . . , (4) provide corrosion control for treated water and raw water pipelines, (5) provide confined space and regulatory training for specific staff, (6) obtain consultant services for strengthening regional infrastructure reliability, (7) execute a Health [and] Safety arc flash remediation study, (8) continue perchlorate remediation in San Martin, (9) optimize . . . systems as well as environmental planning and compliance staffing support for operational and capital projects."

The annual report also shows that total revenue requirements for the 2006–2007 fiscal year were projected to be "$170.3 million to be met from a combination of current revenues, reserves, and debt." The recommended water rates, including the groundwater rate increases, would "generate ap-proximately $124.3 million in revenues from water usage." The balance would be furnished by way of property taxes, interest earnings, and other revenue, plus debt.

As noted, part of the District's operational budget did include capital expenditures, many of which were part of its five-year capital improvement plan, to which some unspecified portion of the revenue generated from the groundwater rate increases would be devoted. The annual report noted that the year's "capital appropriation is estimated to be $35.5 million. More than half of this estimate is for the modification of the Lenihan Dam outlet structure," which is a project that was in the design phase in 2006 but was scheduled to start construction in 2007. The project "will develop and implement a solution to the outlet pipe collapse problems so that the operational restrictions imposed by the California Division of Safety of Dams . . . can be removed." Capital improvements also included monies for the construction and maintenance of "reservoirs, pipelines, recharge ponds, and water treatment plants" and specifically included "Stage 2 of the water treatment plant process upgrades" (to further reduce "levels of disinfection by-products and potential for microbial contaminants in treated water and to further improve water quality"), and construction of a new water quality laboratory building to conduct water quality testing. The report also includes a table listing the District's capital improvement projects for the next five fiscal years. Although these references all relate to capital projects and expenditures, none of them on their face express or connote actual expansion of the District's system beyond existing levels of service.

█ In sum, the District's annual report alone contains substantial evidence supporting the District's finding that the groundwater rate

increases were for the statutorily exempt purposes as stated. In addition to the annual report, proposed budget and groundwater rate increases were discussed in detail at the District Board hearings, the transcripts of which are in the record and also constitute substantial evidence supporting the District's finding concerning applicability of the ratesetting exemption. The transcript from the April 11, 2006 hearing specifically includes staff's projection of what the "low-case recommendation buys[:] Revenues to meet the FY '07 Operations and Capital Budget, ability to meet legal and regulatory obligations, continuation of services currently provided on the areas of conservation, water quality protection and management, groundwater recharge, recycled water, imported water, long-term planning, continued funding to help the perchlorate contamination . . . . In addition, the low-case buys security improvements to the District's water utility facilities, the ability to address critical near-term repair and maintenance needs, and continuation of the internal efficiency programs." All of these appear to fall within the scope of the exemption.

We are thus satisfied that viewed through the lens of the operative standard of judicial review, the administrative record here contains relevant information that a reasonable mind might accept as sufficient to support the conclusion that the purposes of the District's groundwater rate increases fell within the scope of the ratesetting exemption from CEQA. As a result of this conclusion, the District was not compelled to consider or evaluate potential environmental impacts of the rate increases or otherwise conduct further environmental review under CEQA.

Notwithstanding this record, Great Oaks contends that by virtue of the fact that the District's budget included capital expenditures and investment, its purposes for adopting the groundwater rate increases included nonexempt expansion of its system, mandating further environmental review.[13] It points to portions of the annual report that show monies dedicated to construction, improvement, and expansion of recycled water facilities such as the Silver Creek pipeline and the South County recycled water master plan, as well as the water softener pilot project and new laboratory building, as examples of nonexempt expenditures to which increased groundwater rates would be devoted.

But the record fails to show that any of these projects would have the actual effect of expanding the District's total services or overall water-provision system, which includes groundwater, treated water, and recycled water. Although recycled water services, as a component of the District's

---

[13] We observe again that this objection to the increased groundwater rates does not appear in the administrative record and thus may have been forfeited in any event.

total output capacity, might be expanded as a result of specific projects, this fact, without more, does not demonstrate that the rate increases would be for the nonexempt expansion of the District's total services or its entire water-provision system. This fact is rather like the scenario of fare increases to fund a metropolitan transportation district's capital investment for the substitution of propane-powered buses for gasoline-powered buses on some routes within its transportation system. The "system" is surely altered by investment in a different kind of vehicle to be used within it but it is not per se expanded such that the statutory ratesetting exemption would not apply to fare increases for this purpose.

Great Oaks also points to portions of the record that refer to the District's *past* capital expenditures that may have been used to expand the District's services as evidence that the proposed groundwater rate increases would similarly be used for these nonexempt, expansive purposes. In this regard, Great Oaks contends that the District's provision of recycled water service to the Metcalf Energy Center through the Silver Creek pipeline in 2005, the 2002–2003 expanded recycled water facilities in the South County, and its past expanded service to that area, including "the installation and operation of more monitoring wells, development of groundwater computer models, and devoting more resources to acid management, dam safety security and resolving solvents cases" precluded the District's use of the statutory rateset-ting exemption for its 2006–2007 groundwater rate increases. But Great Oaks fails to provide linkage between these past expenditures or projects and the funds to be received in the future from the proposed groundwater rate increases. And again, that the District may have expanded its recycled water facilities does not necessarily mean that such projects expanded the District's existing service area or levels of service such that its use of the exemption would be precluded.

Great Oaks further points to the District's generally stated budgetary practices in a discussion of its financial planning and policies as evidence that the District intends to use funds from rate increases for system expansion. But general descriptions of the District's budgetary policies that "establish requirements that must be met in [the District's] financial planning and management," even when referring to the topic of system expansion, do not furnish substantial evidence of a specific expansion of service to be funded by proposed groundwater rate increases.

Great Oaks also contends that the administrative record shows that the District's purposes in adopting the groundwater rate increases included to "effectuate the District's water resources management strategy," which Great Oaks argues is a nonexempt purpose that rules out its use of the ratesetting exemption altogether here. This contention confuses the District's implemen-tation of policy, which is inherent in all of its quasi-legislative actions, with

its specific act of establishing or approving of rates for particular purposes that are statutorily defined by the manner in which the funds raised by the increased rates will be spent, regardless of the overarching management policies at play. The scope of the exemption is expressed not in terms of management policies but in terms of budgetary purposes. As long as the agency's action is for funding purposes that fall within the scope of the exemption, it matters not what larger legislative policy or management choices the exempt purposes are meant to implement or reflect. Thus, even if the record shows that the District was effectuating groundwater management policy through its groundwater rates, as long as its stated purposes for the use of the funds raised via the rate increases fell within the scope of the statutory exemption, the District's action remained exempt.

Moreover, Great Oaks charges that the District explicitly used groundwater rates to encourage its customers to purchase treated water instead. But the specific portion of the record to which it cites in support of this contention refers to the District's setting of treated water rates, not groundwater rates, and Great Oaks has not challenged the increased treated water rates.

And, finally, there is substantial evidence in the record that the District "sets rates based on the projects, programs and services that will be provided . . . during the rate year[,] not to discourage pumping or land subsistence [or] to restrict underground storage or encourage purchases of surface treated water. In fact, treated water is more expensive than groundwater because of the district costs. Water utility operations funded by groundwater charges are carried out in a manner that is consistent with the District Act and that appropriately balances use of surface and groundwater supplies."

After applying the proper standard of review that constrains our analysis, giving due deference to the District's findings and resolving any conflicts in the evidence in its favor, we conclude that the record contains substantial evidence supportive of the District's finding that the groundwater rate increases were for statutorily exempt purposes. We accordingly reject Great Oaks's challenges to the contrary.[14]

---

[14] This conclusion obviates the need for us to decide whether the proper construction of the ratesetting exemption requires an agency to use 100 percent of funds raised through rate increases for exempt purposes. In other words, that legal question need not be resolved on this record. Nor are we obliged to address the District's contention that Guidelines section 15273, subdivision (b), which states that "[r]ate increases to fund capital projects for the expansion of a system remain subject to CEQA," operates as an exception to the exemption, affecting the burden of proof on the issue.

## DISPOSITION

The judgment is affirmed.

Mihara, Acting P. J., and McAdams, J., concurred.